ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
NICOLE J. KAU
Deputy Attorney General
State Bar No. 292026
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6220
  Fax:  (916) 731-2125
  E-mail:  Nicole.Kau@doj.ca.gov
*Attorneys for Defendant Attorney General Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RICHARD J. KOPPEL,**<br><br>Plaintiff,<br><br>**v.**<br><br>**ROBERT BONTA, in his official capacity as Attorney General of the State of California, DON BARNES, in his official capacity as the Sheriff-Coroner of the County of Orange, State of California, and DOES 1-10,**<br><br>Defendants. | 8:23-cv-00813 (C.D. Cal.)<br><br>**DEFENDANT ROB BONTA'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: October 17, 2023<br>Time: 10:00 a.m.<br>Courtroom: 9D<br>Judge: The Honorable George H. Wu<br>Action Filed: May 9, 2023 |

# TABLE OF CONTENTS

**Page**

Introduction.................................................................................................1

Background.................................................................................................2

    I.    Statutory Background ................................................................2

    II.   Procedural Background................................................................5

Legal Standard ..........................................................................................6

Argument ...................................................................................................6

    I.    Plaintiff Is Not Likely to Succeed on the Merits ...................................6

        A.    *Bruen* Does Not Prohibit Reasonable Firearm Safety Regulations ...........................................................................6

        B.    Plaintiff's Proposed Course of Conduct—Carrying Without Meeting Character Licensing Requirements—Is Not Protected by the Second Amendment's Plain Text............7

        C.    The Good Moral Character and Psychological Exam Requirements Are Consistent with the Historical Tradition of Firearm Regulation.......................................9

            1.    Historical Regulations of the Concealed Carry of Weapons, Including Licensing Laws that Required a Showing of Good Moral Character ...........................10

            2.    Post-Civil War Militia Laws, State Constitutional Provisions, and Loyalty Oath Requirements Allowing Only Persons of Good Moral Character to Bear Arms........................................................12

            3.    Historical Regulations Prohibiting Persons Considered to Be Dangerous or Mentally Unstable from Having or Bearing Arms .....................................14

    II.   Plaintiff Has Not Established Irreparable Harm ..................................17

    III.  The Balance of the Equities and Public Interest Weigh Strongly Against an Injunction.................................................................18

    IV.  The Court Should Deny the Motion Because It Addresses a Licensing Scheme that Will Be Modified by SB 2...........................19

Conclusion ..............................................................................................20

Certificate of Compliance........................................................................21

# TABLE OF AUTHORITIES

**Page**

**CASES**

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ...........................................................2, 7, 8, 10

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*
    529 U.S. 120 (2000) .................................................................... 3

*Kanter v. Barr*
    919 F.3d 437 (7th Cir. 2019) ........................................................ 14

*Maryland v. King*
    567 U.S. 1301 (2012) ................................................................ 18

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
    142 S. Ct. 2111 (2022) ...........................................................*passim*

*Nken v. Holder*
    556 U.S. 418 (2009) .............................................................. 6, 18

*Tracy Rifle & Pistol LLC v. Harris*
    118 F. Supp. 3d 1182 (E.D. Cal. 2015) ............................................ 18

*United States v. Salerno*
    481 U.S. 739 (1987) .................................................................. 6

*Wash. State Grange v. Wash. State Republican Party*
    552 U.S. 442 (2008) .................................................................. 6

*Winter v. Natural Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ..................................................................... 6

**STATUTES**

Ala. Code
    § 13A-11-75(a)(1)(a) ................................................................. 9

Ark. Code Ann.
    § 5-73-308(b)(1) ...................................................................... 9

# TABLE OF AUTHORITIES
## (continued)

**Page**

Cal. Pen. Code

§ 25640 ............................................................................................ 4

§ 26045 ............................................................................................ 4

§ 26050 ............................................................................................ 4

§ 26150 ......................................................................................... 3, 4

§ 26150(a) ........................................................................................ 3

§ 26150(b)(1) .................................................................................... 3

§ 26155 ......................................................................................... 3, 4

§ 26155(a) ........................................................................................ 3

§ 26155(b)(1) .................................................................................... 3

§ 26185(a) ........................................................................................ 3

§ 26185, subd. (a)(2) ........................................................................ 5

§ 26190(f) ........................................................................................ 3

§ 26195 ............................................................................................ 4

§ 26195(a) ........................................................................................ 3

§ 26200 ............................................................................................ 4

§ 26205 ............................................................................................ 4

§ 26215 ............................................................................................ 4

§ 26225 ............................................................................................ 4

§ 26366 ............................................................................................ 4

Colo. Rev. Stat.

§ 18-12-203(2) .................................................................................. 9

Conn. Gen. Stat.

§ 29-28(b) ........................................................................................ 9

Del. Code

§ 1441 (2022) ................................................................................... 9

1881 Fla. Laws 87 ................................................................................ 16

Ga. Code Ann.

§ 16-11-129(d)(4) ............................................................................. 9

Gun Law .............................................................................................. 11

Ill. Comp. Stat.

§ 66/15 ............................................................................................. 9

**TABLE OF AUTHORITIES**
(continued)

Page

Ind. Code Ann.
   § 35-47-2-3(g) ........................................................................... 9

Iowa Code Ann.
   § 724.8(3) ................................................................................... 9

1883 Kan. Sess. Laws 159 .............................................................. 16

1798 Ky. Acts 106 .......................................................................... 14

1795 Mass. Acts 436, Chapter 2 ..................................................... 11

Me. Rev. Stat. Ann., Title 25
   § 2003 ......................................................................................... 9

Minn. Stat.
   § 624.714 ................................................................................... 9

1844 Mo. Laws 577, Chapter 80
   § 4 ............................................................................................. 14

Mo. Rev. Stat.
   § 571.101.2(7) ........................................................................... 9

Mont. Code
   § 45-8-321(2) ............................................................................. 9

N.D. Cent. Code
   § 62.1-04-03(1)(e) ..................................................................... 9

Or. Rev. Stat. 257
   § 1 ............................................................................................. 14

Or. Rev. Stat.
   § 166.293(2) ............................................................................... 9

1779 Pa. Laws 193
   § 4 ............................................................................................. 14

18 Pa. Cons. Stat.
   § 6109(e)(1)(i) ........................................................................... 9

iv

1

### TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

R.I. Gen. Laws

4

§ 11-47-11 .................................................................................................... 9

5

S.D. Codified Laws

6

§ 23-7-7.1 .................................................................................................... 9

7

Utah Code § 53-5-704(3)(a) ........................................................................ 9

8

Va. Code

9

§ 18.2-308.09(13) ........................................................................................ 9

10

Wyo. Stat.

11

§ 6-8-104(g) ................................................................................................. 9

12

**CONSTITUTIONAL PROVISIONS**

13

Second Amendment ............................................................................. *passim*

14

Fifth Amendment ........................................................................................ 5

15

Fourteenth Amendment ................................................................. 11, 12, 13

16

**OTHER AUTHORITIES**

17

1 William Blackstone, *Commentaries on the Laws of England* 139 ...................... 14

18

19

Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*,
Stan. L. Rev. 30 ........................................................................................ 14

20

21

Mark Frassetto, *Firearms and Weapons Legislation up to the Early
Twentieth century* 40-42 ...................................................................... 14, 15

22

23

Gerald N. Grob, *The Mad Among Us: A History of the Care of
America's Mentally Ill* 5-21 (1994) ............................................................ 16

24

25

Mary Ann Jimenez, *Changing Faces of Madness: Early American
Attitudes and Treatment of the Insane* 92 (1987) ................................. 16

26

27

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District
of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J.
1371 (2009) .............................................................................................. 16

28

v

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page**

3    G. Sharp, *Tracts, Concerning the Ancient and Only True Legal Means*
4       *of National Defence, by a Free Militia* 17–18 (3d ed. 1782) ............................ 11

5    R. Spitzer, *Gun Law History in the United States and Second*
6       *Amendment Rights*, 80 Law & Contemp. Probs. 63 (2017) ............................ 11

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2   In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)

3   (*Bruen*), the Supreme Court struck down New York's "proper cause" requirement

4   to obtain a concealed-carry weapons license, but also recognized the authority of

5   states to deny a license to "'individuals whose conduct has shown them to be

6   lacking the essential character of temperament necessary to be entrusted with a

7   weapon.'" *Bruen*, 142 S. Ct. at 2124 n.1 (citing Connecticut's "suitable person"

8   standard approvingly).  Thus, while the Court made clear that California's "good

9   cause" requirement is unconstitutional, *see id.* at 2124 n.2, *Bruen* did not invalidate

10  or call into question the requirement that a license applicant show "good moral

11  character."  To the contrary, the Court repeatedly affirmed that the Second

12  Amendment protects the right of only "'law-abiding, responsible citizens to use

13  arms' for self-defense." *Id.* at 2131 (citing *District of Columbia v. Heller*, 554 U.S.

14  570, 635 (2008)).

15  Plaintiff Richard Koppel nonetheless alleges that California's good moral

16  character and psychological exam requirements violate his Second Amendment

17  rights and asks the Court to enjoin the requirement on a preliminary basis while the

18  Court considers the merits of his claims.  Plaintiff, an Orange County resident,

19  applied unsuccessfully for a Carry Concealed Weapons (CCW) license three times

20  in recent years.  His first two applications were denied by the Orange County

21  Sheriff's Department for lack of good moral character after failing the

22  psychological examination, and his third application was considered withdrawn

23  when he refused to comply with the psychological exam requirement.

24  The motion for a preliminary injunction should be denied.  Plaintiff has not

25  shown a likelihood of success on his facial challenge to the good moral character

26  and psychological exam requirements.[1]  *Bruen* confirms that states may enforce

27

28

---

[1] Plaintiff also brings an as-applied challenge, alleging that Defendant Don Barnes, the Orange County Sheriff-Coroner, failed to properly apply the good

1

licensing schemes to ensure that only "law-abiding, responsible citizens" carry concealed weapons.  In particular, the Court did not "cast doubt" on "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by . . . the mentally ill." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J.); *Heller*, 554 U.S. at 626-27 & n.26.  Moreover, the good moral character and psychological exam requirements fall comfortably within "this Nation's historical tradition of firearm regulation," *id.*—specifically, the well-established tradition of regulating the carry of weapons by untrustworthy, dangerous, or mentally unstable persons.  Plaintiff's failure to show that he will suffer irreparable harm and California's strong public safety interest also weigh heavily against any preliminary injunction.

Alternatively, Plaintiff's motion should be denied without prejudice because of Senate Bill 2 that substantially modifies California's concealed carry licensing regime.  Senate Bill 2 was signed by the governor on September 26, 2023.[2]  By statute, SB 2 will take effect on January 1, 2024, and will soon remove the good moral character requirement in its present form, mooting several of Plaintiff's arguments about the constitutionality of the soon-to-be-superseded licensing scheme.  ECF No. 23-1.  In light of the new law, the Court should deny Plaintiff's motion for a preliminary injunction without prejudice and allow Plaintiff to amend his complaint to address any challenge to this new law.

## BACKGROUND

### I.   STATUTORY BACKGROUND

Under California law, a person generally must obtain a license to carry a firearm in public.  The State's concealed carry licensing regime authorizes county sheriffs and chiefs of police to issue public carry licenses, including licenses "to

---

moral character requirement and denied Plaintiff due process in considering his application.  Defendant Barnes addresses these claims in his opposition brief.

[2] https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202320240SB2.

carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person."  Cal. Penal Code §§ 26150(b)(1), 26155(b)(1).[3]  To obtain a public carry license, an applicant must establish that (1) "the applicant is of good moral character," (2) the applicant is a resident of the relevant county (or has their principal place of business or employment there), and (3) the applicant has completed a course of training.  §§ 26150(a), 26155(a).  Issuing authorities may also require psychological testing.  § 26190(f).[4]  As written, sections 26150(a) and 26155(a) also include a good cause requirement, but it is no longer enforced post-*Bruen* and is not contested here.[5]

State law further provides that "fingerprints of each applicant shall be taken" and that upon receipt of the fingerprints and the requisite fees, the California Department of Justice "shall promptly furnish the forwarding licensing authority a report of all data and information pertaining to any applicant of which there is a record in its office, including information as to whether the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm." § 26185(a).  Licenses "shall not be issued if the [California Department of Justice] determines that the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm."  § 26195(a).

---

[3] All further statutory references are to the California Penal Code unless otherwise referenced.

[4] Plaintiff argues in passing that this statutory provision does not authorize psychological testing.  Mem. 9.  But the only reasonable interpretation of a provision beginning with the clause, "If psychological testing on the initial application is required by the licensing authority," § 26190(f), is that a county sheriff or chief of police has the authority to require an applicant to undergo psychological testing.  This interpretation is also consistent when read in harmony with the CCW licensing conditions set forth in §§ 26150 and 26155.  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.") (cleaned up).

[5] The day after the Supreme Court announced its decision in *Bruen*, the Attorney General issued a legal alert to inform law enforcement that they "may no longer require a demonstration of 'good cause' in order to obtain a concealed carry permit."  *See* https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf.

3

1    An applicant is notified in writing whether the application is approved or

2    denied within 90 days of the initial application or within 30 days after receipt of the

3    criminal background check from the California Department of Justice, whichever is

4    later.  § 26205.  The license is valid for two years, subject to exceptions (§ 26200)

5    and may be amended (§ 26215), renewed (§§ 26150, 26155), or revoked or

6    suspended (§§ 26195, 26225).

7    In certain circumstances, a license is not required to carry firearm in public.

8    There is a focused self-defense exception to California's public-carry restrictions,

9    which authorizes the carrying of a loaded firearm by any individual who reasonably

10   believes that doing so is necessary to preserve a person or property from an

11   immediate, grave danger, while awaiting the arrival of law enforcement, if it is

12   reasonably possible to notify them.  § 26045.  There is also an exception for a

13   person making or attempting to make a lawful citizen's arrest.  § 26050.  In

14   addition, licensed hunters and fishers may carry handguns while engaged in those

15   activities.  §§ 25640, 26366.

16   SB 2, which will become effective on January 1, 2024, will substantially

17   modify California's CCW licensing scheme.  *See* Kau Decl., Ex. A (SB 2 (2023-

18   2024 Reg. Sess.)).  As relevant here, it will remove the good moral character and

19   good cause requirements, *id*., §§ 10-11; will provide that the results of any

20   psychological assessment can be considered in determining whether an applicant

21   may be disqualified from receiving a CCW license, *id.*, § 21; and will add an appeal

22   procedure that allows an unsuccessful applicant to contest the denial of an initial

23   license or renewal application, *id.*, § 23.  It sets forth defined criteria to determine

24   whether a person is disqualified from receiving or renewing a CCW license.  *Id*.

25   § 21.  Such criteria include, among other factors, whether the applicant is

26   "reasonably likely to be a danger to self, others, or the community at large, as

27   demonstrated by anything in the application . . . investigation . . . or as shown by

28   the results of any psychological assessment"; has been subject to certain court

1   orders or convicted of certain crimes; has used a firearm in a reckless manner; or is

2   currently abusing certain controlled substances or alcohol.  *Id.*

3   **II.   PROCEDURAL BACKGROUND**

4       Plaintiff applied to the Orange County Sheriff's Department for a CCW

5   license in 2015, 2017, and 2022.  Carlos Decl.[6] ¶¶ 3, 4, 7.   His first two

6   applications were denied by the Orange County Sheriff's Department for lack of

7   good moral character after he failed to pass a psychological exam, and his third

8   application was withdrawn by OCSD after he refused to complete the psychological

9   exam requirement, a required step of the application process. [7] *Id.* ¶¶ 3, 4, 7-14.

10  He was otherwise found eligible to possess, receive, own or purchase a firearm

11  pursuant to Penal Code section 26185, subdivision (a)(2).  Kau Decl., ¶ 3.

12      Plaintiff filed this lawsuit on May 9, 2023, against Defendants Barnes and

13  Bonta in their official capacities.  ECF No. 1.  He alleges violations of the Second,

14  Fifth, and Fourteenth Amendments, challenging the CCW licensing requirements,

15  fees associated with the application, lack of an appeal procedure, and the

16  psychological exam requirement.  *Id.*  He seeks injunctive and declaratory relief,

17  and nominal damages.  *Id.*, Prayer for Relief.

18      Plaintiff filed a motion for a preliminary injunction on August 14, 2023.  ECF

19  No. 19.  Days later, Defendants moved ex parte for a stay of all proceedings until

20  October 16, 2023, based on the likely enactment of SB 2.  ECF No. 23-1.  The

21  Court denied the request for a stay and continued the hearing on the motion for

22  preliminary injunction to October 17, 2023.  ECF No. 26.

23                        **LEGAL STANDARD**

24      Preliminary injunctive relief is an "extraordinary remedy that may only be

25  awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v.*

26  ——————————————

27  [6] Filed in support of Defendant Don Barnes, Sheriff-Coroner of the County
    of Orange's Opposition to the Motion for Preliminary Injunction.

28  [7] Because Plaintiff did not complete the application process, his due process
    claim—as it relates to the appeal process—is not ripe.

*Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The court must determine (1) whether the moving party has made a strong showing that it is likely to succeed on the merits; (2) whether it will be irreparably injured absent an injunction; (3) whether issuance of the injunction will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

**ARGUMENT**

## I.   PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS

This brief addresses Plaintiff's facial challenge to the good moral character and psychological exam requirements within California's CCW licensing scheme. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Even under the more relaxed standard, "a facial challenge must fail where the statute has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation marks omitted).  Plaintiff has not met either of these standards here.

### A.   *Bruen* Does Not Prohibit Reasonable Firearm Safety Regulations

*Bruen* articulated the analytical framework that governs the Second Amendment claim here.  Under *Bruen*, the analysis is "centered on constitutional text and history." *Id.* at 2128-2129.  *Bruen* held that courts must initially assess whether the "Second Amendment's plain text covers" an individual's "proposed course of conduct"—in other words, whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms." *Id.* at 2126, 2134.  If the answer is no, there is no violation of the Second Amendment.  If the answer is yes, the government can still justify its regulation—and overcome a constitutional

challenge—by showing that the challenged law is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

*Bruen* also repeatedly emphasized that governments may continue to adopt reasonable firearm safety regulations.  The Court recognized that the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133.  And Justice Kavanaugh—joined by Chief Justice Roberts—wrote separately to underscore the "limits of the Court's decision." *Id.* at 2161 (Kavanaugh, J., concurring).  Justice Kavanaugh reiterated *Heller*'s observation that "the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (quoting *Heller*, 554 U.S. at 636).  And he emphasized that the "presumptively lawful regulatory measures" that *Heller* identified—including "longstanding prohibitions on the possession of firearms by felons and the mentally ill"—remained constitutional, and that this was not an "exhaustive" list. *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626-27, 627 n.26).

**B.   Plaintiff's Proposed Course of Conduct—Carrying Without Meeting Character Licensing Requirements—Is Not Protected by the Second Amendment's Plain Text**

Plaintiff argues that "California's CCW licensing scheme [is] presumedly (sic) violative of the Second Amendment." Mem. 2.  That is wrong.  Under the text-and-history standard set forth in *Bruen*, it is Plaintiff's burden to establish that the good moral character and psychological exam requirements infringe on conduct protected by the plain text of the Second Amendment.

Plaintiff cannot meet that burden.  The Second Amendment protects the right of "law-abiding, responsible citizens" to carry arms in self-defense. *Bruen*, 142 S. Ct. at 2138 n.9 (citing *Heller*, 554 U.S. at 635).  But the challenged requirements here "are designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law-abiding, responsible citizens.'" *See id*.  As Justice Kavanaugh noted, "nothing" in the Court's opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[,]" which

are "presumptively lawful." *Id*. at 2162 (Kavanaugh, J.); *Heller*, 554 U.S. at 626-27 & n.26.  Several Justices similarly observed that the decision in *Bruen* did not "disturb[] anything" that the Court previously said "about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *see also id.* at 2162 (Kavanaugh, J., concurring).

Plaintiff contends that the State must justify the licensing requirements through historical analogues because the proposed conduct at issue is broadly defined as "[c]arrying for self-defense," which he argues "is at the very core of the right to keep and bear arms."  Mem. 17.  Yet what Plaintiff seeks here is not merely the right to carry a concealed weapon, but to do so without having to satisfy California's CCW licensing conditions, specifically the good moral character and psychological exam requirements.

*Bruen* does not allow Plaintiff to bypass his burden to establish that his proposed conduct is covered by the Second Amendment in this way.  While the Court struck down New York's "proper cause" requirement, it made clear that states are allowed to have a licensing system with "discretionary criteria." *Bruen¸* 142 S. Ct. at 2124 n.1.  Indeed, the Court counted three states with such regimes—Connecticut, Delaware, and Rhode Island—among the 43 "shall issue" jurisdictions that had permissible licensing schemes. *Id*. at 2124 & n.1.  Connecticut allowed officials to deny a CCW license to anyone who is not a "suitable person"—an individual "whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Id*. at 2124 n.1.  Delaware required an applicant to be a person of "good moral character." *Id.* (citing 11 Del. Code § 1441 (2022)).  And Rhode Island's "suitable person" requirement was cited approvingly by the Court because it did not require the "demonstration of a proper showing of need." *Id*. (internal quotation marks omitted).  In fact, at least 21 of the 43 states referenced in *Bruen* with "shall-issue" licensing standards allow officials to deny licenses to persons "found not to be law-abiding or responsible based on a

1    determination that the applicant lacks the character or temperament to carry

2    firearms in public spaces or otherwise presents a danger to self, others, or the

3    community at large."  Kau Decl., ¶ 2, Ex. A (SB 2, § 1(c)).[8]  Now that the good

4    cause requirement is no longer being enforced, California's licensing scheme—

5    including the requirements that Plaintiff challenges—is likewise on solid

6    constitutional footing.  Because the ability to lawfully carry concealed *is* available

7    to Plaintiff, provided that he meets California's licensing conditions, he may "bear"

8    arms within the meaning of the Second Amendment.

9          **C.    The Good Moral Character and Psychological Exam
10                 Requirements Are Consistent with the Historical Tradition of
                   Firearm Regulation**

11         Even if Plaintiff could show that the Second Amendment presumptively

12   protects the right to carry without meeting licensing requirements, California's

13   good moral character and psychological exam requirements are consistent with a

14   historical tradition of firearm regulation.  In conducting the historical analysis, the

15   government need only identify a "well-established and representative historical

16   *analogue*, not a historical *twin*."  *Bruen*, 142 S. Ct. at 2133.  Thus, a modern-day

17   regulation need not be a "dead ringer for historical precursors . . . to pass

18   constitutional muster."  *Id.*  Instead, in evaluating whether a "historical regulation is

19   a proper analogue for a distinctly modern firearm regulation," *Bruen* directs courts

20   to determine whether the two regulations are "'relevantly similar.'"  *Id.* at 2132

21   (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773

22   (1993)).  The Court identified "two metrics" by which regulations must be

23

24         ───────────────
              [8] The findings in section 1 of SB 2 list the 21 laws referenced:  Ala. Code
25   § 13A-11-75(a)(1)(a); Ark. Code Ann. § 5-73-308(b)(1); Colo. Rev. Stat. § 18-12-
     203(2); Conn. Gen. Stat. §29-28(b); 11 Del. Code § 1441; Ga. Code Ann. § 16-11-
26   129(d)(4); 430 Ill. Comp. Stat. § 66/15; Ind. Code Ann. § 35-47-2-3(g); Iowa Code
     Ann. §724.8(3); Me. Rev. Stat. Ann., Tit. 25, § 2003; Minn. Stat. § 624.714; Mo.
27   Rev. Stat. § 571.101.2(7); Mont. Code § 45-8-321(2); N.D. Cent. Code § 62.1-04-
     03(1)(e); Or. Rev. Stat. § 166.293(2); 18 Pa. Cons. Stat. § 6109(e)(1)(i); R.I. Gen.
28   Laws § 11-47-11; S.D. Codified Laws § 23-7-7.1; Utah Code § 53-5-704(3)(a); Va.
     Code § 18.2-308.09(13); and Wyo. Stat. § 6-8-104(g)).

"relevantly similar under the Second Amendment":  "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.

As further detailed below, the challenged provisions here are consistent with the historical tradition of regulating the carry of weapons by persons perceived to be untrustworthy, dangerous, or mentally unstable.  For centuries, the concealed carry of weapons has been highly regulated in Anglo-American law.  It became common for states and localities to adopt concealed carry licensing schemes around the time of the Fourteenth Amendment's ratification, with many considering criteria such as the applicant's character and temperament.  During this same period, in the post-Civil War South, militia laws and provisions in the new state constitutions for the formerly seceded states were enacted to maintain peace and safety by allowing the bearing of arms only by persons who were loyal and of good moral character.  Historical weapons regulations have also long restricted persons who were perceived to be dangerous—including persons who were likely mentally unstable, known at the time as "vagrants" or "tramps"—from obtaining or carrying dangerous weapons.  The good moral character and psychological exam requirements that Plaintiff challenges here are relevantly similar to these historical analogues and are comparably justified by the public safety goals they promote.

    **1.**    **Historical Regulations of the Concealed Carry of Weapons, Including Licensing Laws that Required a Showing of Good Moral Character**

Prohibitions on carrying concealable weapons date back to the sixteenth century under Henry VIII.  33 Hen. 8, c. 6, § 1 (1541-1542) (Eng.).  The English Bill of Rights, which has "long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, permitted Protestants to carry arms for self-defense, but only "as allowed by law," 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)—and thus, concealed arms, which were not allowed at the time, remained prohibited.  G. Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17–18 (3d ed. 1782).

This tradition continued in America.  Spitzer Decl. ¶¶ 14, 17; R. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 63 (2017).  For example, in 1686, New Jersey enacted a law prohibiting the wearing of weapons "privately."  *Grants, Concessions, and Original Constitutions of The Province of New Jersey* 289–90 (1881).  In 1795, Massachusetts enacted a law empowering justices of the peace to arrest anyone who "shall ride or go armed offensively."  1795 Mass. Acts 436, ch. 2.  And in 1801, Tennessee enacted a law providing that anyone who "shall ride or go armed to the terror of the people, or privately carry any . . . dangerous weapon to the fear or terror of any person" without a surety, would be punished or jailed.  1801 Tenn. Laws 259–60, ch. 22, § 6.

After the Civil War, weapons licensing regimes became more commonplace.  Spitzer Decl., ¶ 17.  Many such licensing laws were enacted in places "where the prevailing legal standard had been to ban the activity or practice outright."  Spitzer Decl. ¶ 19.  This expansion of licensing regimes across America represented "a new and more mature form of government regulation of the activities in question—by tailoring prohibitions to address public-safety threats posed by firearms-related activities . . . and by utilizing regulatory techniques that require more of those in the licensing process, including the gathering and keeping of relevant information."  *Id.*

Local officials were empowered to grant carry licenses, often based on criteria that "included wording that the applicants must be persons of good character or sound judgment."  Spitzer Decl. ¶ 17; *see also* Vorenberg Decl. ¶ 20 ("At the federal and state level during the era of the Fourteenth Amendment, law-makers and law-enforcers denied firearms rights to certain types of individuals, sometimes on the basis of lack of good moral character").  For example, Jersey City's 1871 licensing scheme for concealed weapons carrying of pistols and other dangerous weapons stated that a permit would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-

control."  Spitzer Decl. ¶ 21.  New York City's 1881 permitting requirements similarly specified that carry permits should only be issued to "a proper and law abiding person."  *Id.* ¶¶ 17, 23.  Similar restrictions were enacted in numerous other state and local jurisdictions.  *See id*. ¶¶ 17-37 & Exs. B, C.

### 2. Post-Civil War Militia Laws, State Constitutional Provisions, and Loyalty Oath Requirements Allowing Only Persons of Good Moral Character to Bear Arms

In the post-Civil War South, there was a particular focus on ensuring that only persons of good moral character could bear arms.  Indeed, the Fourteenth Amendment was created in context of "[t]he struggle over ensuring loyalty and moral, law-abiding behavior among southern whites."  Vorenberg Decl. ¶ 51. During this era, as the U.S. government and loyal state authorities worked together "to detect and arrest insurrectionaries and civil-rights violators," "firearms were consistently regulated in a way to prevent them, to the extent possible, from being in the hands of disloyal, unlawful, or immoral people."  *Id.* ¶¶ 32-33.  At the time, these personal characteristics were seen as interrelated:  "disloyal people were generally assumed to be unlawful and immoral, while unlawful and immoral people were generally assumed to be potentially disloyal."  *Id.* ¶ 33.  As loyal state-level authorities coordinated with occupying federal troops to create new, loyal state militias, the U.S. government provided arms to such militias on the condition that they "were composed only of lawful, loyal men."  *Id.* ¶ 34.  One of the duties of these militias was to keep "the peace" by "disarm[ing] members of the community who were known as disloyal, dangerous, or potential disturbers of the moral order." *Id.*  The state laws that created and regulated the militias "were thus antecedents to modern laws limiting the possession and carrying of firearms to those of good moral character," and they "were specifically authorized by the new state constitutions adopted in 1866 to 1868."  *Id.*, n.26 (collecting applicable state constitutional provisions).

Aside from the militia provisions, other clauses in the new southern state constitutions that reinforced the state's authority to regulate the right to bear arms to maintain the peace and safety of the public "were analogous to modern 'good moral character' laws." Vorenberg Decl. ¶ 35.  Take, for example, Florida's 1868 constitution, which expressly protected "the right to bear arms," but also stated that the broad liberties it granted should not be construed "to justify licentiousness or practices subversive of the peace and safety of the State." *Id.*  These two clauses, taken together, "stood for the principle that people had the right to bear arms for self-defense and for militia service," but that this right "had to be checked by what 'the peace and safety' of the State required." *Id.*  In other words, "a 'licentious' person (which is to say a person not of good moral character) would not have had an unchecked right to bear arms." *Id.*  The constitutions of Mississippi, South Carolina, and Tennessee contained similar provisions. *Id.* ¶¶ 35-37.

Militia laws and state constitutional provisions were not the only way that southern states identified good moral character as a factor in determining whether a person should have the right to carry weapons.  At every level of government, "authorities also restricted firearms indirectly—using sworn and evidenced testimony of past loyal, lawful, and moral behavior." Vorenberg Decl. ¶ 58. Federal, state, and local authorities required "southerners of uncertain allegiance and uncertain moral character [] to swear oaths of loyalty, and government officials were authorized to, and did, conduct investigations into the past behavior of those who took the oaths." *Id.*; *see also id.* ¶ 56 ("[L]aw-enforcers in the era of the Fourteenth Amendment could be expected to consult loyalty-oath records in determining who lacked the moral character required to possess or carry a firearm."), ¶ 57 (providing an example to illuminate the point).  These measures ensured "that only loyal and morally law-abiding southerners enjoyed the privileges and rights afforded by the [Fourteenth] Amendment." *Id.* ¶ 58.  Such Reconstruction era oath requirements and investigations are analogous to "the use

of contemporary 'moral character' assessments as an investigative tool to determine a person's qualifications to possess and carry firearms." *Id.*

### 3. Historical Regulations Prohibiting Persons Considered to Be Dangerous or Mentally Unstable from Having or Bearing Arms

Another practice carried over from England to early America was the tradition of prohibiting persons deemed dangerous or mentally unstable from having and bearing arms. As Blackstone recognized, British common law granted people a right to have arms for self-defense "suitable to their condition and degree" and "under due restrictions." 1 William Blackstone, *Commentaries on the Laws of England* 139. The "necessary restraints" on this right were intended to prevent harm to the armed person or others. *Id.* at 140. The colonies and states in the Founding era adopted this tradition, disarming persons thought to pose "immediate threats to public safety and stability." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). For example, Pennsylvania empowered its militia to disarm those who had not taken an oath or affirmation of allegiance to Pennsylvania. 1779 Pa. Laws 193, § 4. And Native Americans and slaves were routinely prohibited from possessing arms. Mark Frassetto, *Firearms and Weapons Legislation up to the Early Twentieth century* 40-42, 80-86.[9] Such status-based laws, which would be unconstitutional today, are based on odious views and stereotypes, but excluding them from consideration would distort the historical record. Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, Stan. L. Rev. Online 30, 37 (2023); *see also id.* at 31 ("Without a full picture of past laws—the prosaic and prejudiced alike—courts risk impermissibly narrowing

---

[9] For example, South Carolina made it unlawful "for any slave, unless in the presence of some white person, to carry or make use of firearms or any offensive weapon whatsoever, unless such negro or slave shall have a ticket or license in writing from his master, mistress or overseer . . . ." 1731-43 S.C. Acts 168, § 23. Kentucky banned any "negro, mulatto or Indian" from "keep[ing] or carry[ing] any gun . . . or other weapon whatsoever . . . ." 1798 Ky. Acts 106. Missouri and Oregon also regulated the sale of firearms to Native Americans. 1844 Mo. Laws 577, ch. 80, § 4; 1853 Or. Rev. Stat. 257, § 1.

the range of legislative options the ratifiers understood to be consistent with the right to keep and bear arms.").

Of particular note among the historical laws regulating persons deemed dangerous or mentally unstable is the tradition of regulating "vagrants" and "tramps."  Before the advent of modern psychology, persons who exhibited "aberrant or abnormal behavior" were identified in the law as "vagrants," "tramps," and the "intoxicated," and were "singled out [] as a suspect category with respect to weapons acquisition and use."  Spitzer Decl. ¶ 44.  More specific references to mentally ill persons—usually referenced with the term "unsound mind"—"did not appear in weapons laws until the late nineteenth and early twentieth centuries, coinciding with the establishment of the modern field of psychology during the same time."  *Id.*

Vagrancy was defined in common law as referring to persons "going about from place to place . . . without visible means of support" and included those who were "idle, and who, thought able to work" refused to do so."  Spitzer Decl. ¶ 45 (quoting Black's Law Dictionary).  The terms "vagrants" and "tramps" were used interchangeably.  *Id.*  Although vagrancy was associated with homelessness and unemployment, it was "also often regarded as the product of a personal deficiency or weakness, encompassing a 'loss of character.'"  *Id.*  Those identified by law as "vagrants" or "tramps" "undoubtedly included some who today would be considered as suffering from mental illness."  *Id.*; *see also id.* ¶ 46 (citing 1715 Maryland law that associated vagrants with persons of "evil fame" and "dissolute liver"); ¶ 47 (citing 1865 Mississippi law broadly defining persons considered to be "vagrants").

In the eighteenth and nineteenth century, at least 15 states enacted laws punishing vagrants or tramps found with firearms or other weapons.  *Id.* ¶ 48, n. 84 (collecting laws).  These laws became more prevalent after the Civil War, when the population of cities grew exponentially.  *Id.*  An 1879 Delaware law was

emblematic of this tradition; it listed a variety of weapons-related infractions, making it is a misdemeanor for "tramps" to "be found carrying any firearm or other dangerous weapon." *Id.* An 1879 Ohio law similarly punished "any tramp" who was "found carrying any firearms or other dangerous weapons." *Id.* (also noting virtually identical 1879 Vermont law). And although laws regulating the possession of dangerous weapons by persons with an "unsound mind" became more typical in the early 1900s, some of the earliest such laws were enacted in the 1880s by Florida and Kansas. *See* 1881 Fla. Laws 87; 1883 Kan. Sess. Laws 159; *see also* Spitzer Decl. ¶ 49, n. 90 & Ex. D (listing laws of 11 states pertaining to possession of dangerous weapons by persons of "unsound mind" or who were "insane" or "not of sound mind").

To the extent that there were not more regulations disarming the dangerously mentally ill in early America, this is likely because persons of "unsound mind" were often physically isolated from the community through confinement at home or were committed to institutions. Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5-21, 29, 43 (1994); *see also* Mary Ann Jimenez, *Changing Faces of Madness: Early American Attitudes and Treatment of the Insane* 92, 103-04 (1987). "[I]n eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.' If this significant infringement of liberty was permissible, then the lesser step of mere disarmament would likely be permissible as well." Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit,* 60 HASTINGS L.J. 1371, 1377 (2009). Thus, additional regulation was unnecessary—it was a given that dangerously mentally ill persons did not have the right to bear arms.

Like the historical laws regulating "vagrants" and "tramps," laws regulating intoxicated persons "are grounded in a long tradition of firearms prohibitions focused on persons considered to be suspect." Spitzer Decl. ¶ 66. Such laws

"restricting or punishing the handling, carrying, or use of firearms while intoxicated appeared among the very earliest weapons regulations in America." *Id.* ¶ 55. From the seventeenth century to the early twentieth century, at least 30 states regulated intoxicated persons in connection with ownership or use of dangerous weapons. *Id.* ("These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated.") *Id.* Laws regulating the carry of dangerous weapons by intoxicated persons became common in the nineteenth century. *Id.* ¶ 59. An 1825 Tennessee law granted localities the authority to penalize intoxicated persons for "shooting and carrying guns." *Id.* An 1868 Kansas law punished persons found to carry a deadly weapon while "under the influence of intoxicating drink." *Id.* And an 1883 Wisconsin law made it "unlawful for any person in a state of intoxication, to go armed with any pistol or revolver." *Id.*[10]

Throughout American history, governmental authorities at every level have enacted laws to prevent persons deemed dangerous or mentally unstable from bearing arms. These laws are analogous to the good moral character and psychological exam requirements at issue here. And like these historical laws, the challenged requirements seek to protect the public, including the applicant, from violence and disorder, by ensuring that only "law-abiding, responsible citizens" carry dangerous weapons.

## II. PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM

Plaintiff does not assert that he has suffered any harm other than the alleged violation of his Second Amendment rights. Because Plaintiff's constitutional rights have not been violated, *ante* Argument I, he has not made a showing of irreparable harm.

---

[10] Numerous other historical weapons laws regulating intoxicated persons can be found in Exhibits E and F to the Spitzer Declaration.

### III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH STRONGLY AGAINST AN INJUNCTION

The balance of equities and public interest factors merge when the government is opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). That is especially true here, where the challenged laws address the State's compelling interest in public safety by ensuring that only law-abiding, responsible citizens carry concealed weapons. *See Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016) (public interest favored the state defendants because granting an injunction would have a detrimental effect on gun crime and violence).

As detailed in SB 2's findings, California has a strong public safety interest in continuing to sensibly regulate the public carry of weapons:

- "Broadly allowing individuals to carry firearms in most public areas increases the number of people wounded and killed by gun violence." Kau Decl., ¶ 3, Ex. A (SB 2, § 1(e).)

- "[S]tudies overwhelmingly support the conclusion that more carrying of firearms in public leads to an increase in crime: of the 35 social science studies looking at this issue since the National Research Council issued its report in 2005, 23 found an increase in crime, 7 found no effect, and 5 found a decrease in crime." *Id.,* Ex. A (SB 2, § 1(i).)

- According to one study, in the 33 states with "right-to-carry" laws, "violent crime was substantially higher—13 to 15 percent higher—10 years after the laws were adopted than it would have been" otherwise. *Id.*, Ex. A (SB 2, § 1(d), citing Donohue, et al., "*Right-to-Carry" Laws and Violent*

*Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis* (2019) 16 J. Empirical Legal Stud. 198.).

- Moreover, "[l]aws requiring an assessment of dangerousness in connection with obtaining firearms have saved lives." *Id.*, Ex. A (SB 2, § 1(l) (one study showed that mass shootings were prevented through gun violence restraining orders; another study showed that 56% of mass shooters exhibit warnings signs prior to shooting)).

In short, the balance of the equities and the public interest in preventing firearm violence favor maintaining a licensing scheme that authorizes only law-abiding, responsible citizens to carry concealed weapons in public. Enjoining, even on a temporary basis, requirements designed to identify individuals who are unsuitable to carry firearms in public because they are dangerous or dangerously mentally ill, will grievously threaten public safety.

## IV. THE COURT SHOULD DENY THE MOTION BECAUSE IT ADDRESSES A LICENSING SCHEME THAT WILL BE MODIFIED BY SB 2

SB 2 will modify California's CCW framework considerably as of January 1, 2024, and as a result, will moot several of Plaintiff's arguments. Plaintiff's complaint challenges the licensing requirement (ECF No. 1, Compl., ¶¶ 48-52, first cause of action), the fees associated with the CCW application (*id.*, ¶¶ 53-55, second cause of action), and the lack of an appeal procedure and the psychological testing requirement (*id.* ¶¶ 56-60, third cause of action). In his prayer for relief, Plaintiff seeks to enjoin the CCW licensing scheme's good moral character and good cause requirements, among other requests. *Id*, Prayer for Relief, ¶¶ 10-13. In his motion for a preliminary injunction, Plaintiff asserts constitutional challenges to the good moral character requirement, the psychological testing requirement, and the lack of appeal procedures in the CCW application process.

SB 2 will remove the good moral character and good cause requirements and replace them with a scheme that disqualifies persons based on specific criteria,

including whether they are "reasonably likely to be a danger to self, others, or the community at large, as demonstrated by anything in the application . . . investigation . . . or as shown by the results of any psychological assessment," Kau Decl., ¶ 4, Ex. A (SB 2, §§ 10-11, 14, 21, *supra* Background I).  SB 2 also adds an appeal procedure for applicants whose applications are denied.  *Id.*, § 23.  Thus, SB 2 will moot the following issues in the motion for a preliminary injunction:  (1) all of Plaintiff's arguments relating to the good moral character requirement, (2) Plaintiff's argument that the psychological exam requirement lacks a statutory basis, and (3) Plaintiff's due process argument that the CCW licensing scheme must set forth an appeal procedure for unsuccessful applicants.  Given these significant and imminent changes to the law, the Court should deny Plaintiff's motion without prejudice and allow Plaintiff to seek a license under the new scheme and amend his complaint if he elects to do so.

## CONCLUSION

The motion for a preliminary injunction should be denied.

Dated: September 26, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General

/s/NICOLE J. KAU
NICOLE J. KAU
Deputy Attorney General
*Attorneys for Defendant Attorney General Ro Bonta*

SA2023302914
Oppposition.docx

1

## CERTIFICATE OF COMPLIANCE

2   The undersigned, counsel of record for Defendant Attorney Bonta, certifies

3 that this brief contains 6,503 words, which complies with the word limit of L.R. 11-

4 6.1.

5

6 Dated:  September 26, 2023    Respectfully submitted,

7              ROB BONTA

               Attorney General of California

8

9              /S/NICOLE J. KAU

10             NICOLE J. KAU

              Deputy Attorney General

11             *Attorneys for Defendant Attorney General Rob Bonta*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name: **Koppel, Richard James v.**          No.   **8:23-cv-00813 (C.D. Cal.)**
**Robert Bonta, et al.**

I hereby certify that on <u>September 26, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT ROB BONTA'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 26, 2023</u>, at Los Angeles, California.

<table>
<tr><td>Lois E. Smith</td><td><i>/s/Lois E. Smith</i></td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2023302914
66254812.docx