RICHARD J. KOPPEL-SBN 94045
Inactive Member of
The State Bar of California
32 Bellvista
Lake Forest, CA 92610
Tel.: (949) 690-7242
Email: richardkoppel16@att.net
*Pro Se*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| RICHARD J. KOPPEL,<br><br>          Plaintiff,<br><br>          v<br><br>ROBERT BONTA, in his official capacity as Attorney General of the State of California, DON BARNES, in his official capacity as the Sheriff-Coroner of the County of Orange, State of California, and DOES 1 – 10.<br><br>          Defendants. | **Case No.:  8:23-cv-00813-GW-DFM**<br><br>**PLAINTIFF'S NOTICE OF ADDITIONAL SUPPLEMENTAL AUTHORITY [SROUR V. NEW YORK CITY]**<br><br>**DATE:      NOVEMBER 1, 2023**<br>**TIME:      10:00 A.M.**<br>**COURT:    U.S.D.C. SANTA ANA**<br>**CRTRM:    6B**<br>**JUDGE:     HON. UNITED STATES MAGISTRATE JUDGE DOUGLAS F. MCCORMICK**<br><br>**ACTION FILED: MAY 9, 2023** |

## TO THE COURT, THE PARTIES, AND THEIR COUNSEL:

**PLAINTIFF NOW GIVES NOTICE OF AN ADDITIONAL SUPPLEMENTAL AUTHORITY.** *Joseph Srour v. New York City*, Case 1:22-cv-00003-JPC (S.D.N.Y. Oct. 24, 2023.)

The Opinion and Order addresses challenges to the Rules of the City of New York and to the New York City Administrative Code and the denial of a license allowing for the ownership of firearms. More specifically, it addresses:

1. A denial for "lack of good moral character."

2. The magnitude of discretion afforded to City official in denying an individual their constitutional right to keep and bear firearms,

3. Those defendants' failure to show failure to show that such unabridged discretion has any grounding in our Nation's historical tradition of firearm regulation, and

4. It is also relevant here since that Plaintiff applied for his license and it was denied and the case was commenced under laws that were amended after the decision in Bruen and the Court analyzed the case under both the old and post Bruen laws, and it considered the effect of damages being sought, as well as nominal damages.

The Decision is attached hereto as Exhibit 1.


Dated October 28, 2023.

/s/ *Richard J. Koppel*
RICHARD J. KOPPEL
*Pro Se*

EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                                                      :
JOSEPH SROUR,                                                         :
                                                                      :
                              Plaintiff,                              :
                                                                      :
              -v-                                                     :            22 Civ. 3 (JPC)
                                                                      :
NEW YORK CITY, New York, and KEECHANT                                :         OPINION AND ORDER
SEWELL, In Her Official Capacity as NYPD Police                      :
Commissioner,                                                         :
                                                                      :
                              Defendants.                             :
                                                                      :
----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

In 2018, Joseph Srour applied to the New York City Police Department ("NYPD") License Division for a permit to possess rifles and shotguns in his home, and the following year he applied for a license to possess handguns in his home. Both applications were denied in 2019, with the License Division's Appeals Unit citing Sections 3-03 and 5-10 of Title 38 of the Rules of the City of New York ("RCNY"), and specifically pointing to Srour's prior arrests, bad driving history, and supposedly false statements on the applications as the reasons for denial. Since then, both Sections 3-03 and 5-10 have been amended.

Srour brings this action against New York City and Edward A. Caban[1] in his official capacity as the Commissioner of the NYPD and therefore the City's firearms licensing official,

_____

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Caban was automatically substituted for Keechant Sewell, his predecessor, upon his appointment as Commissioner of the NYPD on July 17, 2023. *See* NYPD, Police Commissioner, https://www.nyc.gov/site/nypd/about/leadership/commissioner.page (last visited Oct. 23, 2023). Therefore, the Clerk of the Court is respectfully directed to substitute Edward A. Caban for Keechant Sewell in the caption of this case.

challenging those denials.  Srour contends that the pre-amendment versions of Sections 3-03 and 5-10, as well as other related provisions of the New York City Administrative Code, run afoul of the Second Amendment.  While Srour originally alleged that these provisions are unconstitutional both facially and as applied to him, Srour since has abandoned his as-applied challenges and now argues only that the provisions are facially invalid under the Second Amendment.  Before the Court is Srour's motion for summary judgment, which seeks, among other relief, a declaration of the unconstitutionality of these provisions and a permanent injunction preventing Defendants from enforcing them.

Under the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), this Court considers, first, whether the conduct at issue is covered by the text of the Second Amendment, and if so, second, whether the challenged New York City regulations are "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. For reasons that follow, the Court finds that the conduct at issue—the possession of firearms for lawful purposes—plainly falls within the text of the Second Amendment.  Indeed, the Second Amendment safeguards "the right of the people to keep and bear Arms."  U.S. Const. amend. II. Thus, a presumption of constitutional protection is triggered.  Further, Defendants have failed to show that the broad discretion afforded to licensing officials under subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303, which imposes the permit requirement for rifles and shotguns, and the pre-amendment versions of Sections 3-03 and 5-10 of Title 38 of the RCNY, is consistent with the history and tradition of firearm regulation in this country.  Each of these provisions allows for the denial of a firearm permit upon a City official's determination of the applicant's lack of "good moral character" or upon the official's finding of "other good cause"—broad and unrestrained discretionary standards which Defendants have not shown to have

2

any historical underpinning in our country. And because that unconstitutional exercise of discretion occurs every time a licensing official applies or has applied these provisions, they each are facially unconstitutional.

For the reasons more fully discussed below, the Court grants Srour's motion for declaratory and injunctive relief with respect to subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303. The Court also grants summary judgment in Srour's favor on his challenges to the prior versions of Sections 3-03 and 5-10 of Title 38 of the RCNY. However, because Srour has not demonstrated that the other provision he challenges, New York City Administrative Code Section 10-310, which provides for penalties for violations of certain New York City firearms regulations, is unconstitutional in all its applications, the Court denies summary judgment with respect to that provision.

## I.  Background

### A.     Facts[2]

In 2018, Srour, a resident of Brooklyn, New York, applied to the NYPD License Division for a permit to possess rifles and shotguns in his home for self-protection. Pl. 56.1 Stmt. ¶¶ 1, 4; Srour Decl. ¶ 3. That application was denied on or about June 13, 2019. Pl. 56.1 Stmt. ¶ 5; Dkt. 27-2 ("6/13/19 Notice of Application Disapproval"). In its Notice of Application Disapproval, the NYPD License Division explained to Srour:  "The circumstances surrounding your actions

---

[2] These facts are mainly drawn from Srour's statement of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 28 ("Pl. 56.1 Stmt."), Defendants' counter-statement under Rule 56.1(b), Dkt. 33, and Srour's declaration, Dkt. 27 ("Srour Decl."), including the exhibits attached thereto, to the extent that Defendants do not challenge Srour's statements in his declaration. Unless otherwise noted, the Court cites only to Srour's statement of undisputed material facts when Defendants do not dispute the particular fact. These facts are largely recited herein only for framing the background of this case, however, as the specific circumstances giving rise to Srour's permit denials are not material to his facial challenges to the at-issue regulations.

exhibited in your past question your ability to abide by the rules and regulations to possess a rifle/shotgun permit."  6/13/19 Notice of Application Disapproval.  The Notice proceeded to explain:  "Based on your prior arrests for [redacted] you have shown poor moral judgment and an unwillingness to abide by the law.  The above circumstances, as well as your derogatory driving record (twenty-eight moving violations and thirty license suspensions), reflect negatively on your moral character and casts [sic] grave doubt upon your fitness to possess a firearm."  *Id.*

In 2019, Srour submitted another application to the NYPD License Division, this one for a permit to possess handguns in his home for self-protection.  Pl. 56.1 Stmt. ¶ 6; Srour Decl. ¶ 4.  On May 30, 2019, this application too was denied.  Pl. 56.1 Stmt. ¶ 7; Dkt. 27-3 ("5/30/19 Notice of Disapproval").  That Notice of Disapproval explained that Srour's handgun application was denied "per Title 38 of the RULES OF THE CITY OF NEW YORK § 5-10 . . . based" on Srour's prior arrests, two criminal court summonses for "Navigational Law" violations, twenty-eight driving violations, twenty-four driver license suspensions, and six driver license revocations.  5/30/19 Notice of Disapproval.

Srour timely appealed each denial to the Appeals Unit of the NYPD License Division.  Pl. 56.1 Stmt. ¶ 8.  Both appeals were simultaneously denied on November 7, 2019.  *Id.* ¶ 9; Dkt. 27-4 ("11/7/19 Notice of Disapproval After Appeal").  In its Notice of Disapproval After Appeal, the License Division's Appeals Unit detailed its reasoning for rejecting Srour's appeals.  11/7/19 Notice of Disapproval After Appeal at 1.  The Notice began with referencing the good moral character and good cause inquiries under New York State and New York City law:

> Section 400.00 of the New York State Penal Law states that "no license shall be issued except for an applicant . . . (b) of good moral character  . . . and; (n) for whom no good cause exists for the denial of the license."  Title 38 of the Rules of the City of New York (RCNY), Section 5-10, provides a list of factors to be considered in assessing moral character and "good cause."  See, also, 38 RCNY 3-03.

*Id.* The Notice proceeded to articulate particular findings in support of its ultimate determination that Srour lacked good moral character and that good cause existed to deny him either a firearm or rifle permit or a handgun license. It first explained, under a section titled "Arrest History":

> Pursuant to 38 RCNY 5-10 and 38 RCNY 3-03, arrests may be grounds for disapproval of a handgun license or rifle/shotgun permit. On June 7, 1995, Mr. Srour was arrested for [redacted] and on July 11, 1996, he was arrested for [redacted]. Although these cases were dismissed, pursuant to Criminal Procedure Law Section 160.50(1)(d)(3), the License Division may consider the circumstances surrounding these arrests. While these arrests are not recent, Mr. Srour's having been arrested twice, as well as the violent nature of the circumstances surrounding the [redacted] arrest, are factors supporting denial of his applications.

*Id.* Under the next section, titled "Failure to Disclose," the Notice contended that Srour failed to mention those arrests on his firearms applications:

> Failure to disclose arrests on the application is a denial ground. 38 RCNY 5-10(e), 38 RCNY 3-303(e), [sic] as is a displaying [sic] a lack of candor or a failure to cooperate with the background investigation. Section 38 RCNY 5-10(n), 38 RCNY 3-03(n). The firearms applications require the applicant to indicate whether he or she was ever arrested, even if the arrest was dismissed, sealed, voided, or nullified by operation of law. However, Mr. Srour failed to disclose either of his two arrests on his application. He checked "No" in response to the question asking if he had ever been arrested (even if sealed, etc.). In addition, in connection with his Rifle/Shotgun application, Mr. Srour [] signed and notarized an Arrest Information Affidavit stating that "By signing this document, you acknowledge that you understand the requirement to disclose all information relating to your arrest history. Any omission of a previous arrest or any false statements made in relation to your application for a Rifle/Shotgun permit is grounds for denial of a permit."

> Mr. Srour only provided required statements describing the arrests after he had submitted his application, and the investigator, who had independently learned of the arrests, had requested the statements. Therefore, this submission does mitigate [sic] the negative impact on his application stemming from Mr. Srour's failure to disclose his arrests on his application, as required. Even though these were sealed and are not recent, he was very clearly instructed in the application to disclose them and failed to do so.

> Mr. Srour's failure to disclose on his applications that he had been arrested for [redacted], and for other charges, demonstrates a lack of candor and is a strong ground for disapproval of his applications. 38 RNYC 3-03(e) and 5-10(e).

*Id.* at 2. Then, under a section titled "Driver History," the Notice explained its consideration of Srour's driving record:

> Pursuant to 38 RCNY §§ 3-03(h) and 5-10(h), an applicant who has a "poor driving history, has multiple driver license suspensions, or has been declared a scofflaw by the New York State Department of Motor Vehicles," may be denied a rifle/shotgun permit and/or handgun license. Mr. Srour's driving history includes 28 moving violations from June 1991 to December 2013, 24 license suspensions between August 1991 and December 2000, and six license revocations between July 1992 and January 1995. In addition, he received two summons [sic] for Navigational Law violations in August 2012 and in August 2015, both of which were for the same offense (while on a jetski), showing a disregard for the rules even after being informed of them. Notably, Mr. Srour's Navigational Law violations occurred recently. Mr. Srour's poor driving history demonstrates an inability to abide by laws and regulations, shows a lack of moral character, and provides an additional ground for denial.

*Id.* The Notice concluded:

> The circumstances surrounding Mr. Srour's two arrests, his failure to disclose his arrests on the Handgun and Shotgun/Rifle Applications, and poor driving history portray a lack of good moral character and disregard for the law. For all of the reasons stated above, good cause exists to deny his applications and his appeal of the disapproval of [his] Premises Residence handgun license application as well as the Rifle/Shotgun Permit application is denied.

*Id.* at 2-3.

## B. Procedural History

Srour initiated this case on January 2, 2022 against the City of New York and then-Commissioner Sewell, seeking monetary, declaratory, and injunctive relief. Dkt. 1 ("Compl.") at 32-33. In his Complaint, Srour sought declarations that "New York City's discretionary and permissive licensing of handguns under 38 RCNY 5; and rifles and shotguns under 38 RCNY 3; and New York City Administrative Code 10-303 violate the Second Amended facially and as applied to" him, *id.* ¶ 2, and more specifically that New York City Administrative Code Section 10-303(a)(2) and (a)(9) (First Cause of Action); Section 5-10 (a), (e), (h), and (n) of Title 38 of the RCNY (Second Cause of Action); Section 3-03(a), (e), (h), and (n) of Title 38 of the RCNY (Third

6

Cause of Action); and New York City Administrative Code Section 10-310 (Fourth Cause of Action) are unconstitutional, both facially and as applied.  *Id.* ¶¶ 2, 161-172.  His Fifth Cause of Action alleged that these New York City provisions are preempted by New York State law.  *Id.* ¶¶ 173-176.  In addition to declaratory relief, Srour also sought an injunction enjoining Defendants from enforcing these provisions.  *Id.* at 32.

At the initial pre-trial conference on March 14, 2022, the Court stayed this case with the parties' consent pending the United States Supreme Court's resolution of *New York State Rifle & Pistol Association, Inc. v. Bruen*, No. 20-843 (U.S.).  *See* Mar. 14, 2022 Minute Entry.  *Bruen* was decided on June 23, 2022.  *See Bruen*, 142 S. Ct. 2111.  On June 30, 2022, Defendants made an unopposed request that the stay remain in place for another thirty days on account of a special session convened by the New York State Legislature in response to the *Bruen* decision.  Dkt. 14. The Court granted that request the following day.  Dkt. 15.  On July 25, 2022, after New York State amended its firearms regulations, Defendants requested that the stay remain in place for an additional sixty days to afford the City time to consider whether to amend its own regulations. Dkt. 16.  The Court granted that request and ordered the parties to file a joint status letter by September 25, 2022 reflecting, among other things, whether the provisions implicated in this case had been modified.  Dkt. 17.

The parties then filed a joint letter on September 25, 2022, offering their views of the impact of *Bruen* on Srour's claims and further informing the Court that Srour wished to move for summary judgment.  Dkt. 18 at 1-3.  Defendants opposed Srour's request to file a pre-discovery summary judgment motion, taking the position that discovery was necessary given Srour's as-applied challenges to the City's provisions.  *Id.* at 3.  At a conference on November 3, 2022, Srour withdrew his as-applied challenges (thereby obviating the need for discovery) and his preemption

claims,[3] thus presenting only a facial challenge to the regulations, and the Court set a briefing schedule for Srour's motion for summary judgment. Nov. 3, 2022 Minute Entry.

Srour moved for summary judgment on December 16, 2022. Dkts. 25, 26 ("Motion"), 27-28. Defendants opposed on February 21, 2023. Dkts. 31 ("Opposition"), 32-33. Srour filed a reply on March 28, 2023. Dkt. 36. On July 5, 2023, the Court ordered the parties to address recent amendments to Sections 3-03 and 5-10 of Title 38 of the RCNY, which went into effect on December 16, 2022. Dkt. 37. Srour filed a letter addressing those amendments on July 15, 2023, Dkt. 39, and Defendants filed their letter on July 21, 2023, Dkt. 40.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### B. The Second Amendment

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. The Second Amendment "codified a *pre-existing* right": the Amendment "was not intended to lay down a 'novel principle' but rather but rather codified a

---

[3] Accordingly, the Court dismisses Srour's Fifth Cause of Action without prejudice.

8

right 'inherited from our English ancestors.'" *District of Columbia v. Heller*, 554 U.S. 570, 592, 599 (2008) (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)) (alteration omitted); *accord Bruen*, 142 S. Ct. at 2127. As the *Heller* Court emphasized, the Second Amendment "confer[s] an individual right to keep and bear arms," *Heller*, 554 U.S. at 595—a right that is held not just by our country's military but by the people of the United States, *id.* at 579-95. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("[T]he key point that we decided [in *Heller*] was that 'the people,' and not just members of the 'militia,' have the right to use a firearm to defend themselves."). And "the *central component*" of that right is "individual self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (plurality) (quoting *Heller*, 554 U.S. at 599); *accord Heller*, 554 U.S. at 592 (explaining that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation").[4]

That right, of course, is "not unlimited." *Heller*, 554 U.S. at 595. "[T]he right to keep and bear arms is 'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626); *see also Heller*, 554 U.S. at 626 (explaining that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"). The Supreme Court's recent decision in *Bruen* articulated the standard for applying the Second Amendment to a government firearm regulation: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm

---

[4] In *McDonald*, the Supreme Court clarified that the Second Amendment applies to states and municipalities through the Fourteenth Amendment. 561 U.S. at 750.

regulation." *Bruen*, 142 S. Ct. at 2129-30.[5]  To determine whether a firearm regulation is consistent with the Nation's historical tradition of firearm regulation, a court is not required to embark on its own historical inquiry.  Rather, a court is "entitled to decide a case based on the historical record compiled by the parties."  *Id.* at 2130 n.6.  The government bears the burden and must provide material that demonstrates its regulation is consistent with our country's history of firearm regulation.  *Id.* at 2135 ("[T]he burden falls on the respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation."); *see id.* at 2150 ("Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute."); *see also id.* at 2132 ("[W]e find no such tradition in the historical materials that respondents and their *amici* have brought to bear on that question.").[6]

---

[5] In announcing this standard, *Bruen* supplanted the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny" around which the Courts of Appeals, including the Second Circuit, previously "coalesced."  *Bruen*, 142 S. Ct. at 2125.  Under that prior framework, courts first would "determine whether the challenged legislation impinges upon conduct protected by the Second Amendment" and, if so, then would determine "the appropriate level of scrutiny to apply and evaluate the constitutionality of the law using that level of scrutiny."  *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018); *accord Bruen*, 142 S. Ct. at 2126 ("At the second step, courts often analyze 'how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right.'" (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019))); *see, e.g.*, *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96-101 (2d Cir. 2012) (sustaining the New York State "proper cause" standard for public carry, which *Bruen* subsequently invalidated, upon holding that the requirement was "substantially related to the achievement of an important government interest"), *overruled by Bruen*, 142 S. Ct. 2111.  While the *Bruen* Court largely agreed with the first step as "broadly consistent with *Heller*," because that step examines the Second Amendment's text informed by history, *Bruen*, 142 S. Ct. at 2127, the Court made clear that the second step—the means-ends balancing—is not part of the inquiry, *id.* ("Despite the popularity of this two-step approach, it is one step too many."); *see also id.* at 2126 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest.").

[6] In their briefing, Defendants at times seem not to appreciate that it is their burden to come forward with evidence that the challenged regulations are consistent with our country's historical tradition of firearm regulation.  *See, e.g.*, Opposition at 11 ("Notably, plaintiff's memorandum is devoid of citations to source material, statutes, historical analysis, or historical legal precedent to support the assertion that governments did not require individuals to seek permission to keep or

10

The Supreme Court in *Bruen* provided guidance for courts conducting this historical inquiry. Sometimes, the inquiry is straightforward:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131. In other instances, the "historical inquiry that courts must conduct will often involve reasoning by analogy . . . . Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). Two "metrics" of how regulations may be "relevantly similar under the Second Amendment" are "how and why the regulations burden a law-abiding citizen's right to armed self-defense," since, as noted, that right to "individual self defense is 'the *central component*' of the Second Amendment." *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767). "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald*, 561 U.S. at 767). This analogical approach requires the government only to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

---

bear firearms."); *id.* at 11-12 ("Nor does plaintiff provide any historical analysis or contemporary statements regarding the ratification of the Second Amendment to support the conclusory assertion that the challenged regulations are 'entirely inconsistent with this Nation's traditional history of firearm regulation.'" (quoting Motion at 12)). *Bruen* was clear that this is in fact Defendants' burden.

## C.     Facial Constitutional Challenge

A party making a facial challenge to the constitutionality of a statute "can only succeed . . . by 'establish[ing] that no set of circumstances exist under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987));[7] *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."); *see also Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548-50 (2d Cir. 2023) (applying the *Washington State Grange* standard for a facial challenge and rejecting arguments that a more lenient standard should apply). "Facial challenges are disfavored for several reasons," including that such challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied" and that "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 450-51 (citations and internal quotation marks omitted). But when a statute implicates "fundamental rights protected by the Constitution," a facial challenge can be appropriate. *United States v. Requena*, 980 F.3d 30, 40 (2d Cir. 2020).

---

[7] At points, Srour appears to dispute the facts considered by the NYPD License Division in denying his applications, maintaining, for instance, that he told the investigator during the licensing application process about his prior arrests and that those arrests were dismissed because he did not commit a crime. *See, e.g.*, Motion at 1, 11 n.12; Srour Decl. ¶¶ 9, 10. But because Srour has abandoned his as-applied challenges and only argues that the at-issue New York City regulations are facially unconstitutional, any disputes as to such facts are of no moment.

### III.  The Challenged Regulations

New York City has local laws that as a general matter require an individual to obtain a permit or license before possessing a firearm in the City.  *See* N.Y.C. Admin. Code § 10-303 ("[I]t shall be unlawful for any person to have in his or her possession any rifle or shotgun unless said person is the holder of a permit for the possession and purchase of rifles and shotguns."); RCNY Tit. 38, § 3-03 (identifying grounds for the NYPD to deny a rifle or shotgun permit); *id.* § 5-10 (identifying grounds for the NYPD to deny a handgun license); *see also* N.Y. Penal Law § 400.00(6) (requiring a permit from the Police Commissioner of New York City in order for a New York State-issued license to carry or possess a pistol or revolver to be effective in New York City, barring certain enumerated circumstances).

The Notices issued to Srour by the NYPD License Division are not models of clarity in explaining the precise legal grounds for denying his applications to possess firearms.  The June 13, 2019 Notice of Application Disapproval did not cite any particular provision of New York City law for denying Srour a rifle or shotgun permit, but expressed the License Division's concern with Srour's "ability to abide by the rules and regulations to possess a rifle/shotgun permit," and cited his arrests as showing "poor moral judgment and unwillingness to abide by the law" as well as his "derogatory driving record," which combined "reflect negatively upon [Srour's] moral character and casts [sic] grave doubt upon [Srour's] fitness to possess a firearm."  6/13/19 Notice of Application Disapproval.  By using this language, the License Division appeared to rely on the grounds for denial of a rifle and shotgun permit under Section 3-03 of Title 38 of the RCNY and New York City Administrative Code Section 10-303(a)(2).  As quoted more fully *infra*, Section 3-03 at the time provided that such an application may be denied upon a determination that the "applicant lacks good moral character" (as well as more generally for "other good cause") pursuant

to Section 10-303, and then enumerated factors upon which the License Division was required to base that determination to include, among others, an applicant's prior arrests, "poor driving history," and "[o]ther information [that] demonstrates an unwillingness to abide by the law." RCNY Tit. 38, § 3-03(a), (h), (n) (2019) (last amended Dec. 16, 2022).  Section 10-303(a)(2) similarly provides that an applicant may be denied a permit to purchase and possess a rifle or shotgun if he or she "is not of good moral character."  N.Y.C. Admin. Code § 10-303(a)(2).

The May 30, 2019 denial of Srour's application for a handgun license specifically cited Section 5-10 of Title 38 of the RCNY.  5/30/19 Notice of Disapproval.  In addition, this Notice of Disapproval listed the "following reasons" for denying Srour a handgun license:  Srour's arrest history, his criminal court summons history, and his driving record.  *Id.*  These reasons tracked the language in Section 5-10, which at the time required that the licensing official's determination that an applicant "lacks good moral character or that other good cause exists" be based on factors to include the applicant's arrest history, "poor driving history," and "[o]ther history [that] demonstrates an unwillingness to abide by the law."  RCNY Tit. 38, § 5-10(a), (h), (n) (2019) (last amended Dec. 16, 2022).

The Notice of Disapproval After Appeal, issued by the Licensing Division's Appeals Unit, cited both Section 3-03 and Section 5-10 in affirming the denials of Srour's applications.  11/7/19 Notice of Disapproval After Appeal at 1-2.  Like the original denials, the affirmance pointed to Srour's arrest history and his "poor driving history," specifically finding that the latter "shows a lack of moral character."  *Id.* at 1-2.  The Appeals Unit additionally cited Srour's "[f]ailure to disclose arrests on the application[s]" as a ground for denial because it "display[s] a lack of candor or a failure to cooperate with the background investigation."  *Id.* at 2.  Such a failure to disclose a complete arrest history was among the considerations enumerated under each of Section 3-03 and

Section 5-10 that licensing officials were required to consider in making a determination of lack of good moral character or other good cause.  *See* RCNY Tit. 38, §§ 3-03(e), 5-10(e) (2019) (last amended Dec. 16, 2022).  Further, by specifically referencing "a lack of good moral character" and the existence of "good cause" for denying his rifle or shotgun permit, the Appeals Unit also appeared to rely on subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303, discussed more fully below.

Accordingly, the Court considers in this Opinion and Order the constitutionality of Sections 3-03 and 5-10 of Title 38 of the RCNY, as those provisions existed at the time the License Division denied Srour's applications, as well as subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303.[8]  Titled "Grounds for Denial of Permit," Section 3-03 provided that an official may deny a rifle or shotgun permit upon a finding of a lack of "good moral character" or the existence of "other good cause," and identified the factors to be considered in making that assessment.  As relevant to the grounds cited by the NYPD License Division and its Appeals Unit for denying Srour's application for a rifle or shotgun permit, Section 3-03 read at the time:

> In addition to other bases for disqualification pursuant to federal, state, and local law and this chapter, an application for a rifle/shotgun permit may be denied where it is determined that an applicant lacks good moral character or that other good cause exists for denial, pursuant to § 10-303 of the Administrative Code of the City of New York.  Such a determination shall be made based upon consideration of the following factors:
>
> (a) The applicant has been arrested, indicted or convicted for a crime or violation except minor traffic violations, in any federal, state or local jurisdiction.
>
> * * *
>
> (e) The applicant made a false statement on their application, or failed to disclose their complete arrest history, including sealed arrests.  Sealed arrests are made

---

[8] The Court discusses the effect of recent amendments to the RCNY at *infra* IV.A.

15

available to the License Division pursuant to Article 160 of the Criminal Procedure Law when an application has been made for a license to possess a gun.

* * *

(h) The applicant has a poor driving history, has multiple driver license suspensions or has been declared a scofflaw by the New York State Department of Motor Vehicles.

* * *

(n) Other information demonstrates an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or other good cause for the denial of the permit. In evaluating incidents or circumstances pursuant to this section, the License Division shall consider all relevant factors, including but not limited to the number, recency and severity of incidents and the outcome of any judicial or administrative proceedings.

RCNY Tit. 38, § 3-03 (2019) (last amended Dec. 16, 2022).

Section 5-10, titled "Grounds for Denial of Handgun License," similarly identified grounds for denying a handgun license. Like Section 3-03, Section 5-10 permitted denial of a handgun license upon a determination of lack of "good moral character" or the existence of "other good cause," and enumerated factors to be considered in arriving at that determination. At the time that Srour's application was denied, Section 5-10 read, as relevant here:

In addition to other bases for disqualification pursuant to federal, state, and local law and this chapter, an application for a handgun license may be denied where it is determined that an applicant lacks good moral character or that other good cause exists for denial, pursuant to New York State Penal Law § 400.00 (1).[9] Such a determination shall be made based upon consideration of the following factors:

---

[9] At the time that Srour's applications were denied, New York Penal Law Section 400.00(1) stated that "[n]o license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true. No license shall be issued or renewed except for an applicant [who satisfies certain enumerated conditions]." N.Y. Penal Law § 400.00(1) (2019) (last amended Dec. 9, 2022). Srour's Fifth Cause of Action, since withdrawn, alleged that this provision preempted the at-issue City provisions. *See* Compl. ¶¶ 173-76.

(a) The applicant has been arrested, indicted or convicted for a crime or violation except minor traffic violations, in any federal, state or local jurisdiction.

\* \* \*

(e) The applicant made a false statement on their application, or failed to disclose their complete arrest history, including sealed arrests.  Sealed arrests are made available to the License Division pursuant to Article 160 of the Criminal Procedure Law when an application has been made for a license to possess a gun.

\* \* \*

(h) The applicant has a poor driving history, has multiple driver license suspensions or has been declared a scofflaw by the New York State Department of Motor Vehicles.

\* \* \*

(n) Other information demonstrates an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or other good cause for the denial of the license.

RCNY Tit. 38, § 5-10 (2019) (last amended Dec. 16, 2022).

Section 10-303 of the New York City Administrative Code makes it unlawful for someone to possess a rifle or shotgun without a permit and specifically identifies the absence of "good moral character" and a general notion of "good cause" as legitimate grounds for denying someone such a permit.  Both these grounds were cited by the Appeals Unit as reasons for denying Srour's application for a rifle or shotgun permit.  The relevant language of Section 10-303, which remains in effect, is as follows:

It shall be unlawful to dispose of any rifle or shotgun to any person unless said person is the holder of a permit for possession and purchase of rifles and shotguns; it shall be unlawful for any person to have in his or her possession any rifle or shotgun unless said person is the holder of a permit for the possession and purchase of rifles and shotguns.

17

The disposition of a rifle or shotgun, by any licensed dealer in rifles and shotguns, to any person presenting a valid rifle and shotgun permit issued to such person, shall be conclusive proof of the legality of such disposition by the dealer.

(a) *Requirements*.  No person shall be denied a permit to purchase and possess a rifle or shotgun unless the applicant:

* * *

(2) is not of good moral character; or

* * *

(9) unless good cause exists for the denial of the permit.

* * * *

N.Y.C. Admin. Code § 10-303.  And as noted above, at the time Srour was denied a rifle or shotgun permit, Section 3-03 of Title 38 of the RCNY expressly referenced Section 10-303's "good moral character" and "good cause" language in articulating grounds allowing for denial of a permit.

Srour challenges one other provision of New York City law in this action:  New York City Administrative Code Section 10-310.  Unlike the other challenged provisions, Section 10-310 does not address the issuance of firearm permits.  Rather, this Section provides for penalties for violations of the Administrative Code's firearms provisions:

Except as is otherwise provided in sections 10-302 and 10-303.1, violation of sections 10-301 through 10-309 and of rules and regulations issued by the commissioner pursuant thereto shall be a misdemeanor punishable by a fine of not more than one thousand dollars or imprisonment of not more than one year or both, provided that the first violation of such sections involving possession of an unregistered rifle or shotgun or rifle or shotgun ammunition or an ammunition feeding device which is designed for use in a rifle or shotgun and which is capable of holding no more than five rounds of rifle or shotgun ammunition shall be an offense punishable by a fine of not more than three hundred dollars or imprisonment of not more than fifteen days, or both on condition that (a) the first violation of possession of an unregistered rifle and shotgun or rifle and shotgun ammunition or an ammunition feeding device which is designed for use in a rifle or shotgun and which is capable of holding no more than five rounds of rifle or shotgun ammunition is not in conjunction with the commission of a crime and (b) the possessor has not been previously convicted of a felony or a serious offense and (c)

18

the possessor has not previously applied for and been denied a permit for such possession.

N.Y.C. Admin. Code § 10-310.

## IV. Discussion

### A. Srour's Standing

Effective December 16, 2022, the NYPD amended both Section 3-03 and Section 5-10 of Title 38 of the RCNY. *See* New York Police Department, Notice of Adoption of Final Rule (Dec. 13, 2022), https://rules.cityofnewyork.us/wp-content/uploads/2022/10/Permanent-Rule-FINAL-12.13.22.pdf, at 3-4, 20-21 ("Notice of Adoption"); *see also* 240 City Record 6129-41 (Dec. 16, 2022)."

There were three main changes to Section 3-03. The first sentence of Section 3-03 was amended to remove the phrase, "or that other good cause exists for denial, pursuant to § 10-303 of the Administrative Code of the City of New York."[10] Second, the following two sentences were added after, "if it is determined that an applicant lacks good moral character":

> For the purposes of this chapter, "good moral character" means having the essential character, temperament and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others. For the purposes of the preceding sentence, the use of force that is reasonably necessary to protect oneself or others shall not be construed as endangering oneself or others.

Notice of Adoption at 4. And lastly, Section 3-03(n), which formerly generally encompassed other information showing a failure to abide by the law, a lack of candor toward authorities, a lack of concern for safety, or other good cause for denial of a rifle or shotgun permit, was amended to now read:

---

[10] New York City has not amended New York City Administrative Code Section 10-303, which continues to provide, *inter alia*, that a rifle or shotgun permit may be denied if "good cause exists for denial of the permit." N.Y.C. Admin. Code § 10-303(a)(9).

> Other information that demonstrates a lack of good moral character, including but not limited to an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety or an inability to maintain rifle/shotgun possession in a manner that is safe to oneself or others.

*Id.*

Similar amendments were made to Section 5-10. The first sentence likewise was amended to remove the phrase, "or that other good cause exists for denial." And Section 5-10(n) was amended to now read:

> Other information that demonstrates the lack of good moral character, including but not limited to an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or an inability to maintain handgun possession in a manner that is safe to oneself or others.

*Id.* at 20-21.[11]

Therefore, Srour was denied permission to possess firearms upon application of certain provisions of the RCNY that since have been amended. Because Srour alleges to have been injured by, *inter alia*, the application of the former versions of these regulations and seeks compensatory damages as a result, Srour has standing to challenge them. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02 (2021) ("Because nominal damages were available at common law in analogous circumstances, we conclude that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right."). The Court therefore will consider below whether the discretion granted to licensing officials under the versions of Sections 3-03 and 5-10 of Title 38 of the RCNY that were in effect in 2019 (as well as under the relevant provisions of the current version of New York City Administrative Code Section

---

[11] The expanded definition of "good moral character" that was added to Section 3-03 was not added to Section 5-10.

10-303) was inconsistent with the history and tradition of firearm regulation in this nation and so violative of the Second Amendment.

Srour, however, has not been denied permission to possess firearms pursuant to a City official's application of the current version of either Section 3-03 or Section 5-10. Nor has he shown how he might bring a preemptive challenge against the amended provisions prior to being denied a license or permit under them, or even that he has reapplied for such a license or permit. He thus has alleged no injury in fact arising from the current version of either provision. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("To establish Article III standing, an injury must be [among other things] concrete, particularized, and actual or imminent . . . . Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes— that the injury is *certainly* impending. Thus, we have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact and that allegations of *possible* future injury are not sufficient." (internal quotation marks and alterations omitted)); *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 135 (2011) ("The party who invokes the power of the federal courts must be able to show not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement." (quoting *Doremus v. Bd. of Educ. of Hawthorne*, 342 U.S. 429, 434 (1952))). The Court therefore does not reach herein the constitutionality of the current versions of Sections 3-03 and 5-10.

Accordingly, at issue before the Court are the following provisions: (1) the pre-December 16, 2022 version of Section 3-03 of Title 38 of the RCNY; (2) the pre-December 16, 2022 version of Section 5-10 of Title 38 of the RCNY; (3) the current version of New York City Administrative Code Section 10-303(a)(2); and (4) the current version of New York City Administrative Code

Section 10-303(a)(9).  The Court will refer to these provisions collectively as the "Challenged Firearms Licensing Provisions."  The other provision at issue—New York City Administrative Code Section 10-310—does not concern the issuance of a firearm license or permit, and is addressed separately below.  *See infra* IV.E.

## B.  Whether the Conduct is Protected

As noted, the Second Amendment safeguards "the right of the people to keep and bear Arms."  U.S. Const. amend II.  The Supreme Court held in *Bruen* that

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

142 S. Ct. at 2126 (internal quotation marks omitted).  Thus, the initial question for this Court under *Bruen* is whether the "conduct" at issue in the Challenged Firearms Licensing Provisions is covered by the plain text of the Second Amendment.

The answer to this question turns on what conduct is actually at issue.  Srour argues that the conduct is the "possession of handguns, rifles, and shotguns."  Motion at 7.  If the challenged conduct is the possession of firearms for a lawful purpose,[12] the conduct plainly falls within the

---

[12] While Srour does not add the "for a lawful purpose" qualifier, the Court does not take Srour to argue that possession of firearms for unlawful purposes, such as the commission of a crime, is a constitutionally protected right.  *See Heller*, 554 U.S. at 595 ("[W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*.").  Indeed, the parties agree that Srour submitted both applications so that he could possess the firearms "in his home for self-protection."  Pl. 56.1 Stmt. ¶¶ 4, 6.  To examine whether a regulation may restrict the *unlawful* use of firearms is simply to examine a tautological truth that would essentially bar all facial challenges to firearms regulations.  The Court therefore considers only

scope of the Second Amendment. *See Bruen*, 142 S. Ct. at 2122 ("In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree . . . ."); *Heller*, 554 U.S. at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."); *id* at 636 (holding that the Second Amendment forbids the "absolute prohibition of handguns held and used for self defense in the home"); *see also Bruen*, 142 S. Ct. at 2134 (observing that "individuals often 'keep' firearms in their home, at the ready for self-defense").

While Defendants' briefing does not expressly reveal their view as to the conduct at issue in this case, they maintain that the Second Amendment applies only to "responsible" and "law-abiding" individuals. Opposition at 11. Because a "good moral character" requirement separates those who are "responsible" and "law-abiding" from those that are not, Defendants argue, the challenged regulations are not "presumptively unconstitutional" but instead "presumptively constitutional." *Id.* In other words, Defendants seem to identify the conduct challenged in this case as the possession of firearms by someone lacking good moral character and reason that such conduct is not protected under the Second Amendment because such a person is not "responsible" and "law-abiding."

The Court disagrees. The conduct at issue is the possession of a firearm. The question is whether such conduct in possessing firearms may be constitutionally regulated. Whether an applicant "lacks good moral character" is not part of the *conduct* being regulated. The requirement that an applicant submit to a determination of moral character instead is the regulation itself. In

those lawful purposes of firearms possession in conducting its analysis of the facial constitutionality of the Challenged Firearms Licensing Provisions.

arguing otherwise, Defendants impermissibly merge a person's conduct with their status as defined by the regulation. *Bruen*, however, draws a clear distinction between the individual's conduct and the regulation which burdens that conduct. *See* 142 S. Ct. at 2126 ("Only if a firearm *regulation* is consistent with this Nation's historical tradition may a court conclude that the individual's *conduct* falls outside the Second Amendment's unqualified command." (emphasis added) (internal quotation marks omitted)). This makes sense. Under Defendants' theory, the government would be able to skirt a court's analysis of the history and tradition of firearm regulation, as required by *Bruen*, merely by roping the actual regulation into the individual's conduct. *See Range v. Att'y Gen.*, 69 F.4th 96, 102-103 (3d Cir. 2023) (*en banc*) (rejecting "the Government's claim that only 'law abiding, responsible citizens' are protected by the Second Amendment," and explaining that such "extreme deference" would "give[] legislatures unreviewable power to manipulate the Second Amendment by choosing a label" and "to decide whom to exclude from 'the people'" (internal quotation marks and citations omitted)).[13]

---

[13] Post-*Bruen*, courts in this Circuit have largely agreed that the classification of a person as not "law-abiding" does not alter the characterization of the relevant conduct under the *Bruen* test. In *United States v. Rowson*, No. 22 Cr. 310 (PAE), 2023 WL 431037, at *18-19 (S.D.N.Y. Jan. 26, 2023), for instance, the court determined that those indicted for felonies remained part of "the people" who possessed Second Amendment rights and so considered the criminalization of their possession of firearms under *Bruen*'s framework. Similarly, courts have determined that possession of firearms by felons is "conduct" covered by the Second Amendment and so have analyzed the criminalization of such possession under *Bruen*'s framework. *See United States v. Martin*, No. 21 Cr. 68, 2023 WL 1767161, at *2 (D. Vt. Feb. 3, 2023) (determining that a felon's "possession of a firearm constitutes 'keep[ing]' an 'Arm' under the Second Amendment's plain text" (alteration in original)); *Campiti v. Garland,* No. 22 Civ. 177 (AWT), 2023 WL 143173, at *3 (D. Conn. Jan. 10, 2023) ("The plain text of the Second Amendment covers the plaintiff's potential conduct."). And in *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 298 (N.D.N.Y. 2022), the court stated that a determination of whether one is of good moral character "does not *precede* the application of the Second Amendment, but *follows* it." The only post-*Bruen* in-Circuit decision the Court has located that does not engage in a history and tradition analysis is *Gazzola v. Hochul*, No. 22 Civ. 1134 (BKS) (DJS), 2022 WL 17485810 (N.D.N.Y. Dec. 7, 2022), which determined that the text of the Second Amendment did not cover the commercial sale of firearms.

The Court therefore determines that the conduct at issue here—the possession of firearms for lawful purposes—is covered by the plain text of the Second Amendment. The assessments of "good moral character" or "good cause" are regulations which the government must justify "by demonstrating that [they are] consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Court therefore turns to that inquiry.

**D.  Whether Subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303 and the Former Versions of Sections 3-03 and 5-10 of Title 38 of the Rules of the City of New York Are Consistent with the Nation's Historical Tradition of Firearm Regulation**

As discussed, the Challenged Firearms Licensing Provisions each contains the same or very similar "good moral character" and "good cause" language. New York City Administrative Code Section 10-303(a) states that no person shall be denied a permit to possess a rifle or shotgun unless the "applicant . . . (2) is not of good moral character; or . . . (9) unless good cause exists for the denial of the permit." N.Y.C. Admin. Code § 10-303(a). At the time of the denial, Section 3-03 and Section 5-10 of Title 38 of the RCNY contained largely identical standards for denying rifle or shotgun permits and for handgun licenses, respectively. They provided, much like Section 10-303, that an application "may be denied where it is determined [by the licensing body] that an applicant lacks good moral character or that other good cause exists for denial." RCNY Tit. 38, §§ 3-03, 5-10 (2019) (last amended Dec. 16, 2022). The licensing body made that determination under Sections 3-03 and 5-10 based upon "consideration" of several "factors," including whether the "applicant has been arrested, indicted or convicted for a crime or violation," *id.* § 3-03(a); *id.* § 5-10(a); whether the applicant has made a "false statement on [their] application, or failed to disclose their complete arrest history, including sealed arrests," *id.* § 3-03(e); *id.* § 5-10(e); whether the applicant "has a poor driving history, has multiple driver license suspensions or has been declared a scofflaw by the New York State Department of Motor Vehicles," *id.* § 3-03(h); *id.*

§ 5-10(h); or otherwise if "[o]ther information demonstrates an unwillingness [of the applicant] to abide by the law, a lack of candor towards lawful authorities . . . and/or other good cause for the denial of the permit," *id.* § 3-03(n); *id.* § 5-10(n).  Section 3-03(n), concerning the issuance of a rifle or shotgun permit, further provided:  "In evaluating incidents or circumstances pursuant to this section, the License Division shall consider all relevant factors, including but not limited to the number, recency, and severity of incidents and the outcome of any judicial or administrative proceeding."  *Id.* § 3-03(n).

Srour argues that the application of "discretionary factors" like those enumerated in these provisions of New York City law "to deny firearm licenses violates the Second Amendment." Motion at 8 (capitalization removed).  While Defendants fail to fully address the "good cause" language of these provisions, they respond that "good moral character" requirements impose a constitutional limitation of Second Amendment rights to those who are "law-abiding" and "responsible" citizens, Opposition at 10-11, and that the challenged provisions have historical analogues in regulations that barred "firearm possession by categories of people perceived by society to be dangerous" and in "Colonial surety laws, which restricted citizens' firearm access based on allegations of wrongdoing," *id.* at 13, 15.[14]

To start, *Bruen* itself, while addressing a different New York State statute, poses considerable obstacles for Defendants to overcome in defending the Challenged Firearms

---

[14] Defendants go to great lengths to argue that *Bruen* did not disturb a municipality's ability to implement licensing requirements for firearms.  *See, e.g.*, Opposition at 2, 9-13.  But the issue before this Court is not whether a municipality may impose a constitutionally permissible licensing requirement for people to possess firearms within its jurisdiction.  *Cf. Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring) ("[T]he Court's decision does not prohibit states from imposing licensing requirements for carrying handguns for self-defense.").  Rather, the Court confronts here the extent to which a government, consistent with the Second Amendment, may enact laws restricting the ability of someone to obtain such a license and thereby possess a firearm.

Licensing Provisions. The petitioners in *Bruen* challenged New York State's licensing regime, which at the time required an applicant seeking to possess a gun at home to "convince a 'licensing officer'—usually a judge or law enforcement officer—that, among other things, he is of good moral character, has no history of crime or mental illness, and that 'no good cause exists for the denial of the license.'" *Bruen*, 142 S. Ct. at 2122-23 (quoting N.Y. Penal Law §§ 4000.00(1)(a)-(n) (2022)). An applicant seeking to carry a firearm also had to "prove that 'proper cause exists' to issue [a license]." *Id.* at 2123 (quoting N.Y. Penal Law § 4000.00(2)(f)). The court contrasted a "may issue" regime like New York's, "under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria," with "shall issue" regimes, "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id.* at 2123-24. In stating that "nothing in [the court's] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," the Court described such regimes as being "designed to ensure only that those bearing arms in the jurisdiction are in fact, law-abiding, responsible citizens," and stated that they did so using "only narrow objective and definite standards guiding licensing officials, rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion— features that typify proper-cause standards like New York's." *Id.* at 2138 n.9 (internal quotation marks omitted). After conducting a lengthy and thorough review of "the Anglo-American history of public carry," the Court held that the respondents failed to meet "their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156.

The Challenged Firearms Licensing Provisions land very close to the problematic "may issue" laws criticized in *Bruen*. *Cf. id.* at 2162 (Kavanaugh, J., concurring) ("Going

forward . . . the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States."). The Challenged Firearms Provisions empower a City licensing official to decide not to issue a permit or license for a firearm based on that official's discretionary assessment of the applicant's "good moral character" and the determination of a vaguely defined presence of "good cause." Much like the "proper-cause" inquiry invalidated in *Bruen*, permitting denial of a firearms license based on a government official's "good moral character" or "good cause" assessment has the effect of "prevent[ing] law-abiding citizens with ordinary self defense needs from exercising their right to keep and bear arms." *Bruen*, 142 S. Ct. at 2156. Under the former versions of both Sections 3-03 and 5-10, a licensing official would make a judgment call about the character, temperament, and judgment of each applicant without an objective process. There are some objective *components* that come into play this process: whether or not an applicant has been arrested, indicted, or convicted of a crime, for example, is a discernible fact. *See* RCNY Tit. 38, §§ 3-03(a), 5-10(a) (2019) (last amended Dec. 16, 2022). But the former versions of Sections 3-03 and 5-10 did not specify how a licensing official was to consider those facts, or even that any of those facts was dispositive; Sections 3-03 and 5-10 only generally required their consideration by the official in arriving at the ultimate conclusion of whether to deny a permit or license based on the applicant's lack of "good moral character" or "other good cause." *See id.* §§ 3-03, 5-10. Relatedly, and probably more problematically, by allowing the official to make a determination of the person's moral character, and to vaguely consider "other good cause," Sections 3-03 and 5-10 further bestowed vast discretion on licensing officials. *Id.* Indeed, subsection (n) of each provision allowed a licensing official to deny a permit based on "[o]ther information [that] demonstrates . . . other good cause

for the denial of the permit." *Id.* §§ 3-03(n), 5-10(n). The permissive language of these provisions—allowing that a permit "may be denied"—does not undermine the fact that the challenged regime requires "the appraisal of facts, the exercise of judgment, and the formation of an *opinion*" prior to the issuance of a license. *Bruen*, 142 S. Ct. at 2138 n.9 (emphasis added) (internal quotation marks omitted). Subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303 suffer from the very same constitutional flaws under *Bruen*. These provisions allow a City official to deny a shotgun or rifle permit after finding that an applicant "is not of good moral character" or that "good cause exists for the denial of the permit." N.Y.C. Admin. Code § 10-303(a)(2), (a)(9). Section 10-303 itself defines neither of these terms in further detail, with the factors enumerated in Section 3-03 of Title 38 of the RCNY implementing Section 10-303. Without doubt, the very notions of "good moral character" and "good cause" are inherently exceedingly broad and discretionary. Someone may be deemed to have good moral character by one person, yet a very morally flawed character by another. Such unfettered discretion is hard, if not impossible, to reconcile with *Bruen*.

The Court now turns to whether Defendants have shown a historical basis for the Challenged Firearms Licensing Provisions. To reiterate, the Supreme Court made clear that this is the government's burden:

> To support [the respondents' claim that the Second Amendment permits a state to condition handgun carrying in areas frequented by the general public on showing a non-speculative need for self defense in those areas], the burden falls on the respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct.

*Id.* at 2135.

Under *Bruen*'s historical inquiry analysis, the Court initially considers whether the "challenged regulation addresses a general societal problem that has persisted since the 18th century" and, if so, whether there was "a distinctly similar historical regulation addressing that problem." *Bruen*, 142 S. Ct. at 2131. Defendants are not particularly clear regarding what, if anything, they consider to be the "general societal problem" addressed by both the Challenged Firearms Licensing Provisions in this case and our country's historical tradition of firearm regulation. They do, however, indicate that both the challenged provisions and their suggested historical analogues are geared towards "ensuring public safety." Opposition at 16. For essentially the same reasons discussed below in conducting an analogical analysis, the historical information presented by Defendants fails to reveal a "distinctly similar historical regulation" to the at-issue provisions. *Id.* The Court therefore turns to "reasoning by analogy," *id.* at 2132, and considers the degree of relevant similarity between the challenged provisions and the historical tradition presented by Defendants.[15]

Here too, the fatal problem with subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303 and the former versions of Sections 3-03 and 5-10 of Title 38 of the RCNY continues to lie in the broad discretion afforded to City officials in determining whether someone may exercise their Second Amendment right. Defendants have not identified any historical analogue for investing officials with the broad discretion to restrict someone's

---

[15] Defendants provide no information about whether any burdens caused by the Challenged Firearms Licensing Provisions and the proposed historical analogues are "comparably justified." *Bruen*, 142 S. Ct. at 2133. Other than asserting that both aim to "ensur[e] public safety," Defendants fail to discuss the justifications for either set of laws. *See* Opposition at 16. The Court therefore focuses its analysis on comparing burdens, assuming the public safety justifications to be roughly equal so as to avoid impermissible interest balancing. *See Bruen*, 142 S. Ct. at 2131 ("The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." (internal quotation marks omitted)).

Second Amendment right based on determining the person to "lack[] good moral character" or for a vague and undefined notion of "good cause." And while this Court finds allowing such a discretionary determination to run afoul of the Second Amendment, Defendants have not even identified a historical analogue for the various non-determinative considerations that were required to go into the official's "good moral character" and "other good cause" assessments under Sections 3-03 and 5-10. Moreover, and as mentioned, subsection (n) of each of those Sections affords tremendous—and seemingly boundless—discretion to the licensing official in making that lack of "good moral character" or "good cause" determination by allowing the official to consider "[o]ther information [that] demonstrates an unwillingness to abide by the law, a lack of candor toward lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or *other good cause for the denial of the permit*." RCNY Tit. §§ 3-03(n), 5-10(n) (2019) (last amended Dec. 16, 2022) (emphasis added).

Defendants have no more success in arguing that "Founding-era regulations[16] restricted firearms sales to people that the Founders deemed dangerous or potentially dangerous." Opposition at 13. But a law preventing a person who is "dangerous or potentially dangerous" from possessing a firearm is hardly analogous to denying someone their Second Amendment's rights

---

[16] The Second Amendment was adopted in 1791 and the Fourteenth Amendment was adopted in 1868. The parties dispute whether historical regulations subsequent to the Founding era may be considered by the Court. *See* Motion at 5-6; Opposition at 9 (arguing that Reconstruction era regulations are also relevant). The answer appears to remain unsettled. *See Bruen*, 142 S. Ct. at 2137 ("[W]e have generally assumed the scope of the protection applicable to the Federal Government and the States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." (citations omitted)); *id.* at 2138 (acknowledging the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope," but declining to address the issue because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry"). Here, given that the proposed historical analogues provided by Defendants all seem to come from the Founding era, the Court need not resolve this dispute.

based on a City official's discretionary determination that that person "lacks good moral character" or that "good cause" exists. *See* N.Y.C. Admin. Code 10-303; RCNY Tit. 38 §§ 3-03, 5-10 (2019) (last amended Dec. 16, 2022). The latter is far broader and sweeps in significantly more conduct. More importantly, this Court finds no evidence in the historical materials that Defendants identify of a tradition of regulations of the sort challenged here.[17]

First, Defendants point to "statutes disarming classes of people deemed to be threats, including those unwilling to take an oath of allegiance (to the crown and later the states), slaves, and native Americans." Opposition at 13-14 (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012)). But those examples hardly entailed the sort of discretionary disarming that is at issue in this case. Loyalty oath requirements, for instance, provided an objective criterion for an administering official to assess: did the person make the oath or not? These historical requirements also seem to have disarmed those who previously had been able to exercise their right to bear arms, rather than serving as a prerequisite to legally obtaining arms in the first place. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 505-08 (2004) (discussing in particular laws in Pennsylvania and Massachusetts that disarmed those who would not take an oath of allegiance to the state). The materials examined by the courts in *National Rifle Association of America, Inc.*, 700 F.3d at 200, and *Rowson*, 2023 WL 431037, at *21, also suggest that classes of people were subject to disarmament in the Founding

---

[17] Presumably, there were plenty of people at the time of our country's Founding who were considered to lack good moral character, but were not necessarily dangerous, yet Defendants have identified no law depriving such individuals of their right to possess firearms.

era based on specific characteristics.[18]  But Defendants have provided no historical analogue for denying a person's exercise of their Second Amendment right upon on a municipality official's subjective assessment of that person's character, or based on a vague determination of the existence of good cause—particularly when that determination is made after weighing in an undefined manner both objective and subjective factors.  Defendants' argument that the government previously could disarm those that were "perceived dangerous" when certain identified criteria were met, and so now can prohibit firearm possession when an administrative official deems a person not to have "good moral character" or otherwise finds "good cause," is unavailing.

Defendants also cite Founding era surety laws.  Generally speaking, and as potentially relevant here, these provisions empowered government officials, typically justices of the peace, to restrain those who committed certain acts until they provided a surety of their good behavior.  *See Statutes at Large of Pennsylvania from 1682 to 1801*, Chapter XXVI at 23 (James T. Mitchell & Henry Flanders eds. 1896) (1700 statute) ("Be it enacted . . . [t]hat whosoever shall threaten the person of another, to wound, kill or destroy him, or do him any harm in person or estate, and the person so threatened shall appear before a justice of the peace and attest that he believes that by such threatening he is in danger to be hurt in body or estate; such person so threatening as aforesaid shall be bound over, with one sufficient surety, to appear at the next sessions or county court . . . and, in the meantime, to be of his good behavior and keep the peace towards all the King's

---

[18]  In *Rowson*, the court pointed to statutes disarming persons "perceived as *per se* dangerous, on the basis of their religious, racial, and political identities."  2023 WL 431037, at *21 (citations omitted).  The Fifth Circuit in *National Rifle Association of America, Inc.* commented that "[t]he historical record shows that gun safety was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books" to include "laws disarming certain groups and restricting sales to certain groups."  700 F.3d at 200 (citations omitted).

subjects."); Samuel Adams & John Adams, *Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven*, Chapter IV at 52 (1797) (1700 statute) ("Be it enacted . . . [t]hat whosoever shall threaten the person of another, to wound, kill or destroy him, or do him any harm in person or estate, and the person so threatened shall appear before a justice of the peace, and attest, that he believes that by such threatening he is in danger to be hurt in body or estate; such person so threatening as aforesaid, shall be bound over, with one sufficient surety, to appear at the next sessions or county court . . . in the mean time, to be of his good behaviour, and keep peace towards all the king's subjects."); Hartford Press, *Acts and Laws of His Majesties Colony of Connecticut in New-England*, 91-92 (1901) (1702 statute) ("Be it enacted. . . that effectual means may be used and improved for the preserving and promoting of the peaceable and civil behavior and good cooperation of His Majesties Subjects in this Colony, and for preventing and suppressing of what is contrary thereunto . . . [and] [t]hat the Surety of the Peace or good behavior, as the merit of the Case shall require, may and shall be granted (by any of His Majesties Assistants or Justices of the Peace in this colony) against all and every such person and persons, as by [committing various acts] and if any such person or persons shall refuse to give surety for the peace or good behavior, it shall be in the power of any Assistant or Justice of the Peace, to commit such person or persons to the common Goal, there to remain till delivered according to Order of Law.").[19]  A

---

[19] Defendants additionally cite to what appears to be the entirety of the statutory law of Maryland from 1692 to 1839, without a pin-cite to identify any specific provision that they wish to bring to the Court's consideration.  *See* Opposition at 16.  Further, Defendants cite William Rawle, *A View of the Constitution of the United States of America*, 126 (2d ed. 1829), for his statement that "even the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace."  This statement does not resolve the constitutional infirmities of the City's challenged regulations discussed herein.  But the Court also

34

somewhat similar Virginia law granted certain members of the judiciary the power to demand surety of persons to ensure their good behavior.  *See* William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, From the First Session of the Legislature, in the Year 1619*, 41 (1823) (1789 statute) ("The judges of the court of appeals, high court of chancery and general court shall be conservators of the peace throughout the Commonwealth; and the justices of the peace in each county and corporation shall be conservators of the peace within their several countries and corporations respectively, and the said judges and justices within the limits aforesaid respectively shall have power to demand of such persons, as are not of good fame, sufficient surety and mainprize of their good behavior.").

These historical surety provisions lack relevant similarity to the Challenged Firearms Licensing Provisions to constitute a valid historical analogue.  To start, and most significantly, the lack of "good moral character" or "other good cause" standards under the former Sections 3-03 and 5-10 of Title 38 of the RCNY and subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303 are vastly broader than the circumstances that triggered a surety obligation under these statutes.  Nor is it clear why Defendants believe that these surety statutes, which generally provide for a person to be "bound over" and do not mention firearms or arms of any kind, provide comparable burdens for regulating the possession of firearms or even are relevant to the issue of firearms possession.  Presumably, Defendants' point is that an individual who was "bound over" lacked access to his firearms, or perhaps that the firearms themselves might be given as a surety, but their brief does not say so one way or the other.  *See* Opposition at 15-16.  To the extent that Defendants contend that the greater restraint of imprisoning

---

notes that the quoted sentence from Rawle's treatise occurs in his discussion of the law of England, which is actually cited in juxtaposition to a discussion of the Second Amendment.

an individual included the lesser restraint of depriving him of his firearms, these provisions do not appear to have empowered officials to permanently deprive liberty or arms, only to demand a surety before release from detention.  If the suggestion is that a firearm itself might have been the surety, nothing provided by Defendants indicates any restriction on firearm possession or the length of time any firearm might be kept.  The *Bruen* decision, however, suggests that these surety laws may have extended to *carrying* firearms in public.  In conducting its historical analysis of surety statutes, the Court noted that "[i]n the mid-19th Century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before *carrying weapons in public*." *Bruen*, 142 S. Ct. at 2148 (emphasis added); *see also id.* (citing an 1836 Massachusetts statute that "required any person who was reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense to post a bond before publicly carrying a firearm" and noting that "[b]etween 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law" (citing Mass. Rev. Stat., ch. 134, § 16)).  The *Bruen* Court additionally noted a key distinction when it comes to surety laws:  surety laws that restricted the carry of firearms presumed that individuals had a right to public carry, which could be burdened only by a specific showing of reasonable fear of an injury or breach of the peace.  *Bruen*, 142 S. Ct. at 2148 (stating that "the surety statues *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing").  That is quite different from the situation here, where a New York City official can deny the right to possess a firearm in the first instance based on a vague and unconstrained finding of a lack of "good moral character" or the presence of "good cause."  And the Court in *Bruen* further expressed skepticism that such surety laws were regularly enforced to an extent that they burdened the right to bear arms.  *See id.* at 2149 ("Besides, respondents offer little evidence that authorities ever enforced surety laws.").  Defendants do not

36

provide any additional information in this regard. Thus, the Court cannot conclude that the cited surety statutes can be considered analogous to the challenged New York City licensing provisions.

Defendants point to two other statutes in place at the time of the Founding in endeavoring to find a historical analogue. Neither is. They cite a 1692 Massachusetts statute which provided:

> That every justice of the peace in the county where the offense is committed, may cause to be staid and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively before any of their majesties' justices or other their officers or ministers doing their office or elsewhere by night or by day, in fear or affray of their majesties' liege people, and such others shall utter any menaces or threatening speeches; and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison until he find sureties for the peace and good behavior, and seize and take away his armour or weapons, and shall cause them to be apprized and answered to the kind as forfeited . . . .

Wright & Potter, *Acts and Resolves, Public and Private of the Province of the Massachusetts Bay*, Chapter 18, 52-53 (1692) (1692 statute); *see* Opposition at 15. Defendants also cite an 18th Century New Hampshire statute that appears quite similar to the Massachusetts law. *See* Opposition at 15; *see also Bruen*, 142 S. Ct. at 2142-43. The New Hampshire statute provided:

> And every justice of the peace within this province, may cause to be stayed and arrested, all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches: And upon view of such justice, confession of the offender, or legal proof of any such offense, the justice may commit the offender to prison, until he or she finds such sureties for the peace and good behaviour, as is required, according to the aggravations of the offense; and cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use.

Daniel Fowle, *Acts and Laws of His Majesty's Province of New Hampshire in New England with Sundry Acts of Parliament*, 1-2 (1761) (1759 statute).[20]

---

[20] Defendants refer to this as a "1701 statute," Opposition at 15, but the statute appears to have been passed in 1759, Fowle at 1-2; *see also Rowson*, 2023 WL 431037, at *22 ("In 1759, New Hampshire enacted a substantially identical statute empowering justices of the peace to arrest

Unlike other historical statutes cited by Defendants, these Massachusetts and New Hampshire laws do directly address "weapons" and, in the case of the New Hampshire statute, "arms." These two laws also appear to have vested at least some degree of discretion in justices of the peace, providing for sureties and confiscation of arms "upon view of such justice." But the Massachusetts and New Hampshire statutes, unlike the City licensing provisions challenged in this case, authorized disarmament of a limited and clearly defined group of people. The Massachusetts statute was limited to "all affrayers, rioters, disturbers or breakers of the peace" who "ride, or go armed offensively" or cause "fear or affray of their majesties' liege people," and those who "utter any menaces or threatening speeches." The New Hampshire statute similarly was limited to "all affrayers, rioters, disturbers or breakers of the peace," as well as others "who shall go armed offensively, or put his Majesty's subjections in fear, by menaces or threatening speeches." The challenged New York City regulations, meanwhile, apply broadly to those seeking to possess a firearm. And nothing in either the Massachusetts or New Hampshire statute provides a burden on the right to bear arms comparable to a holistic and discretionary assessment of an individual's character or other unspecified good cause *prior to* that individual's ability to exercise their right to possess a firearm. The fact that justices of the peace in those states were empowered to take firearms instead indicates that but for the specified activity—*e.g.*, fighting, rioting, or disturbing or breaking the peace—the right to possess those arms was presumed.[21] The discretion of the

---

'all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear' and, 'upon view of such justice,' 'cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use.'" (citing Fowle at 1-2)).

[21] To be sure, what is constitutionally problematic in this case is not necessarily assessing a license or permit applicant for dangerousness, but rather the excessive discretion vested in licensing officials in making that determination based on "good moral character" or "good cause." Both the Massachusetts and New Hampshire statutes directed officials to look at specific types of

justices of the peace under these Massachusetts and New Hampshire statutes thus was considerably more limited, both in terms of the subjects of consideration and those to whom they applied that discretion, than the discretion afforded to City officials under the Challenged Firearms Licensing Provisions.

These are facial problems with the constitutionality of the Challenged Firearms Licensing Provisions. The discretion of the licensing officials in assessing "good moral character" and "good cause" necessarily was invoked under Section 3-03 and 5-10 of Title 38 of the RNCY for each firearm application submitted under those provisions, regardless of approval or denial, and regardless of the presence of some, all, or none of the enumerated factors. In other words, every time a New York City official denied a rifle or shotgun permit pursuant to the former Section 3-03 and a handgun license pursuant to the former Section 5-10, the official acted pursuant to an unconstitutional exercise of discretion. This makes those provisions facially invalid.[22]

New York City Administrative Code Section 10-303 requires a different analysis. That provision operates differently from the RCNY provisions by establishing nine independent grounds for denial of a rifle or shotgun permit in subsection (a), using the disjunctive "or" between

---

prior activity by the individual in assessing whether that person should be disarmed. These activities essentially constituted recent behaviors that breached the general peace, and were not so expansive as to include, among other factors, the payment of debts, candor towards officials, and "any other information." And again, even if these statutes bore greater relevant similarity to the provisions currently before this Court, Defendants have provided no evidence regarding the extent to which these statutes were actually enforced or burdened rights.

[22] The Court's holding that the excessive discretion vested to the licensing officials pursuant to the former Sections 3-03 and 5-10 does not pass muster under the Second Amendment is based on the discretionary authority afforded to the licensing officials to allow them to deny applicants their Second Amendment rights based on a determination of "good moral character" or "other good cause" in all circumstances. As such, the Court does not reach herein whether the consideration of any one of the enumerated factors in those regulations violates the Second Amendment. Even a required consideration of a constitutionally valid factor, conducted in the context of an overall constitutionally impermissible assessment, is itself unconstitutional.

39

each enumerated ground. *Cf. Loughrin v. United States*, 573 U.S. 351, 357 (2014) (noting that the "ordinary use [of the word 'or'] is almost always disjunctive, that is, the words it connects are to be given separate meanings" (internal quotation marks omitted)). While a City official's consideration of the "good moral character" and more general "good cause" provisions runs afoul of the Second Amendment for the reasons discussed above, not every assessment under the auspices of Section 10-303(a) (and, indeed, perhaps not even a majority) necessarily involves those two subsections. Consider, for instance, a rifle or shotgun permit application submitted by someone under the age of twenty-one. This applicant would presumably be denied a permit under subsection (a)(1), which allows for denial if the applicant "is under the age of twenty-one," without necessarily implicating the "good moral character" or "good cause" provisions. Indeed, Srour himself seems to be attuned to that distinction between Section 10-303 and the RCNY provisions detailed above, since he narrowly tailors his requested relief to subsections (a)(2) and (a)(9) of the former. *See* Complaint at 32-33 (requesting declaratory and injunctive relief as to subsections (a)(2) and (a)(9)). The Court similarly concludes that only subsections (a)(2) and (a)(9) in their isolation raise Second Amendment concerns, unlike the section-wide problems detailed above with respect to the former versions of the RCNY provisions.

In sum, having considered Defendants' proffered historical materials, and applying the standard set in *Bruen*, the Court determines that the magnitude of discretion afforded to New York City licensing officials under subsections (a)(2) and (a)(9) of Section 10-303 of the New York City Administrative Code and the pre-December 16, 2022 versions of Sections 3-03 and 5-10 of Title 38 of the RCNY, empowering them to evaluate an applicant's "good moral character" and "good cause" in deciding whether to permit that applicant to exercise his or her Second Amendment rights, is not constitutionally permissible under the Second and Fourteenth Amendments.

E.    **New York City Administrative Code Section 10-310**

Srour additionally challenges the constitutionality of New York City Administrative Code Section 10-310, which generally makes it a crime to violate "sections 10-301 through 10-309 and . . . rules and regulations issued by the commissioner." N.Y.C. Admin. Code § 10-310; *see* Motion at 13-14. Because Srour is only proceeding on a facial challenge, to prevail he must show that all applications of Section 10-310 are unconstitutional. But Section 10-310 criminalizes far more than violations of subsections (a)(2) and (a)(9) of Section 10-303, which are invalidated above, and even more than conduct involving the possession of firearms. Section 10-310 reaches conduct such as defacing the name of the maker, model, or serial numbers of a rifle, shotgun, or assault weapon, as well as selling a firearm with such a defacement, *see* N.Y.C. Admin. Code § 10-309, and possessing ammunition feeding devices above a certain capacity, *id.* § 10-306. Srour has presented no argument that such conduct is protected by the Second Amendment, and so has failed to establish that Section 10-310 is facially unconstitutional.

F.    **Severability**

The Court's conclusion that subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303 run afoul of the Second Amendment raises a question of severability to which the Court must turn before fashioning adequate relief to remedy the constitutional harms identified above. Put simply, can the reset of Section 10-303 survive without these two subsections? *Cf. Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2208 (2020) (plurality opinion) ("[R]esolving [severability] is a necessary step in determining petitioner's entitlement to its requested relief."); *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 331 (2006) ("Only a few applications of New Hampshire's parental notification statute would present a constitutional problem. So long as they are faithful to legislative intent, then, in this case the lower courts can

41

issue a declaratory judgment and an injunction prohibiting the statute's unconstitutional application.").

"Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Seila Law*, 140 S. Ct. at 2209 (internal quotation marks omitted). "[T]he touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature," in this case the New York City Council through its enactment of the permitting system espoused by Section 10-303.[23] *Ayotte*, 546 U.S. at 330 (internal quotation marks omitted); *cf. Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 499 n.40 (E.D.N.Y. 2018) ("When portions of a New York statute are found unconstitutional, the intent of the state legislature in originally enacting the statute is the touchstone in determining whether the remainder of the statute is severable and may be spared from the unconstitutional taint." (quoting *Gen. Elec. Co. v. N.Y. State Dep't of Lab.*, 936 F.2d 1448, 1460 (2d Cir. 1991))). "The severability of a state statute is to be determined according to state law." *Gen. Elec.*, 936 F.2d at 1460. Under New York law, "[t]he question is in every case whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether." *CWM Chem. Servs., L.L.C. v. Roth*, 846 N.E.2d 448, 455 (N.Y. 2006) (internal

---

[23] For sake of clarity, the New York State Legislature codified what is now Section 10-303 as part of its larger recodification of the City Administrative Code in 1985. *See* 1985 New York Laws 3737, 3906. The New York City Council originally enacted the permitting scheme espoused by that section through local laws. *See* N.Y.C. Local Law 106, § 1 (1967) (enacting former Section 436-6.6 of the Administrative Code, which is the predecessor provision of Section 10-303). The New York City Council appears to have enacted the "good moral character" and "good cause" provisions in 1984, *see* N.Y.C. Local Law 5, § 8 (1984), although it bears mentioning that the original 1967 version of Section 436-6.6 had similar language to the effect that "[n]o person of good character . . . shall be denied a permit to purchase and possess a rifle or shotgun," and also permitted the denial of a permit if "the issuance of a permit . . . would not be in the interests of public health, safety or welfare," N.Y.C. Local Law 106, § 1 (1967).

quotation marks omitted). "The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots." *Id.* (internal quotation marks omitted).

Here, the Court has little trouble concluding that the subsections (a)(2) and (a)(9) are severable from the rest of Section 10-303. First of all, New York City Administrative Code Section 1-105 provides: "If any clause, sentence, paragraph, section or part of the code shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, section, or part thereof directly involved in the controversy in which such judgment shall have been rendered." N.Y.C. Admin. Code § 1-105. This is a "broad severability clause of general applicability." *Ass'n of Home Appliance Manufs. v. City of New York*, 36 F. Supp. 3d 366, 377 (S.D.N.Y. 2014) (citing N.Y. Admin. Code § 1-105). But, more generally, the notion that the New York City Council would have preferred for the entirety of Section 10-303 to be "rejected altogether" strains credulity. Section 10-303(a) articulates multiple alternative grounds for an official to deny a shotgun or rifle permit, with individual subsections identifying reasons entirely unrelated to an applicant's character or general good cause, including the applicant's age and criminal history, to name two examples. *See* N.Y.C. Admin. Code § 10-303(a)(1) (age limitation); *id.* § 10-303(a)(3) (convictions limitation). Nor can the Court discern any reason to believe that Section 10-303 is unworkable without subsections (a)(2) and (a)(9), since City officials can simply continue to process permit applications by considering the seven other subsections.

Given these factors, the Court severs subsections (a)(2) and (a)(9) from the rest of Section 10-303 and fashions a remedy in light of this severance.

G.     **Injunctive and Declaratory Relief**

Having conducted the severability analysis, the Court turns to analyzing whether Srour's requested injunctive and declaratory relief is warranted in this case.

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "To obtain a permanent injunction, a plaintiff must [also] succeed on the merits . . . ." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (Sotomayor, J.).

The Court has already concluded that Srour succeeds on the merits of his facial challenge to subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303. The Court also finds that all four of the *eBay* factors weigh in Srour's favor. First, Srour has suffered irreparable injury by being denied his Second Amendment rights under these provisions. As the Supreme Court noted in *Bruen*, "[t]he Second Amendment is the very product of an interest balancing by the people, and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S. Ct. at 2131 (internal quotation marks omitted). Nor would remedies at law suffice to repair this harm. Defendants have applied subsections (a)(2) and (a)(9) to deny Srour a shotgun or rifle permit, and the Court cannot discern from the record any reason to believe that Defendants will not continue to enforce those unconstitutional provisions going forward in the absence of equitable relief. Relately, district

courts around the country have found permanent injunctions to constitute appropriate relief for violations of Second Amendment rights stemming from unconstitutional state statutes. *See Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 22 Civ. 410, 2023 WL 5617899, at *5 (E.D. Va. Aug. 30, 2023) (collecting cases). Turning to the balance of hardships, as previously noted, Srour has suffered a significant hardship in being denied his Second Amendment rights. The government, on the other hand, "does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (internal quotation marks omitted); *see also Fraser*, 2023 WL 5617899, at *6 ("[A]ny minimal hardship that may befall the Government from not being able to enforce the unconstitutional statute and regulations must yield to that harm suffered by the individual whose constitutional rights are being denied by the Government's conduct."). The hardship to the government should also be minimized by the Court's severance of subsections (a)(2) and (a)(9) from the rest of Section 10-303, as the other provisions of Section 10-303 remain valid and enforceable. Finally, "the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld," *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) (internal quotation marks omitted), a proposition that certainly rings true for rights as "fundamental" as those protected by the Second Amendment, *Bruen*, 142 S. Ct. at 2151. In sum, with all four *eBay* factors in Srour's favor, the Court concludes that a permanent injunction is plainly warranted in this case with respect to subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303.

"In order to decide whether to entertain an action for declaratory judgment, [the Second Circuit has] instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the

controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. These criteria too are met here. As detailed above, the question of whether subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303 are facially unconstitutional is central to this case. Given that these provisions are still in effect, Srour's exercise of his Second Amendment rights to obtain a permit to possess rifles and shotguns going forward in many ways depends on the issuance of declaratory relief. A declaration of these two provisions' unconstitutionality would thus help "clarify[]" and "settl[e]" the issues in this case; doing so would offer Srour "relief from uncertainty" as to his constitutional rights.

## H.    Remedy

For reasons discussed, the Court grants in part Srour's requested declaratory relief, declaring that subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303 are facially unconstitutional. The Court also grants injunctive relief with respect to subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303, and permanently enjoins Defendants from enforcing those subsections. The Court *sua sponte* stays the injunction until midnight on October 26, 2023 to afford Defendants an opportunity to consider their appellate options and whether they wish to seek a stay pending any appeal.

The Court denies Srour declaratory relief as to New York City Administrative Code Section 10-310 because, as discussed, his facial challenge fails as to that Section. An injunction or declaration as to the pre-December 16, 2022 versions of Section 3-03 and Section 5-10 is neither necessary nor appropriate, as those provisions are no longer in effect and, as noted, the current versions of those Sections are not before this Court. *See supra* IV.A.

This Court previously bifurcated the questions of liability and damages. *See* Minute Entry dated Nov. 3, 2022. The parties shall file a joint letter containing a proposed discovery plan regarding Srour's damages claims, as well as a proposed briefing schedule for Srour's anticipated motion for attorneys' fees and costs, by October 30, 2023.

## V. Conclusion

This case is not about the ability of a state or municipality to impose appropriate and constitutionally valid regulations governing the issuance of firearm licenses and permits. The constitutional infirmities identified herein lie not in the City's decision to impose requirements for the possession of handguns, rifles, and shotguns. Rather, the provisions fail to pass constitutional muster because of the magnitude of discretion afforded to City officials in denying an individual their constitutional right to keep and bear firearms, and because of Defendants' failure to show that such unabridged discretion has any grounding in our Nation's historical tradition of firearm regulation.

For the previously stated reasons, the Court grants Srour's motion for summary judgment in part and denies it in part. The Court grants summary judgment in favor of Srour on his First, Second, and Third Causes of Action as facial challenges, and dismisses without prejudice any as-applied challenges brought in those Causes of Action. The Court denies Srour's motion for summary judgment with respect to his facial challenge in the Fourth Cause of Action, and dismisses without prejudice the as-applied challenge brought in that Cause of Action. The Court also dismisses the Fifth Cause of Action without prejudice. In reaching this holding, the Court finds that Srour is entitled to a declaration that subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303 are facially unconstitutional. The Court further determines

47

that Srour is entitled to injunctive relief enjoining the enforcement of subsections (a)(2) and (a)(9) of Section 10-303.   The stay will remain in effect under midnight on October 26, 2023.

The parties shall file a joint letter as described in *supra* IV.H by October 30, 2023.   The Clerk of Court is respectfully directed to close the motion pending at Docket Number 25.

SO ORDERED.

Dated: October 24, 2023
New York, New York

_____
JOHN P. CRONAN
United States District Judge

# CERTIFICATE OF SERVICE

## BY CM/ECF

**Case Name:   Richard J. Koppel v. Robert Bonta, et al.**

**Case No. 8:23-cv-00813 (C.C. Cal.)**

I hereby certify that on October 28, 2023, I electronically filed the following document with the Clerk of the Court by using the SM/ECF system:

**PLAINTIFF'S NOTICE OF ADDIIONAL SUPPLEMENTAL AUTHORITY [SROUR V. NEW YORK CITY]**

I certify that **all** participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California that this Declaration was executed October 28, 2023, at Lake Forest, California.

/s/ *Debra C. Koppel*

DEBRA C. KOPPEL
Declarant